UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| UNITED STATES OF AMERICA, Plaintiff, v. KIMBERLEE PITAWANAKWAT, Defendant. | 5:20-CR-50122 **MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS** |
|---|---|

COMES NOW Defendant, Kimberlee Pitawanakwat, by and through her Counsel, Jonathan P. McCoy of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, LLP, and submits this Memorandum of Law in support of Defendant's Motion to Suppress, pursuant to Rule 47.1 of the Local Rules for the United States District Court for the District of South Dakota.

## STATEMENT OF FACTS

1. On September 17, 2020, an Indictment was filed in the United States District Court, Western Division of the District of South Dakota, charging Defendant Kimberlee "Stormy" Pitawanakwat (hereinafter, "Pitawanakwat"), with one count of "willfully and knowingly mak[ing] and caus[ing] to be made materially false, fictitious, and fraudulent statement and representations in a matter within the jurisdiction of a department and agency of the United States" charging specifically that "Kimberlee 'Stormy' Pitawanakwat[ ] reported to Oglala Sioux Tribe Department of Public Safety Criminal Investigator Derek Puckett that George Dull Knife had not been present at his residence at all on August 5, 2020, and that no shooting had occurred on the property, when she then there well knew

1

that George Dull Knife was present on the property on August 5, 2020, and used a firearm on that date . . . all in violation of 18 U.S.C. § 1001(a)(2)."

2. The indictment further charged Pitawanakwat with one count as follows: that she "did receive, relieve, comfort, and assist the offender, George Dull Knife, in order to hinder or prevent his apprehension, trial, and punishment, all in violation of 18 U.S.C. § 3."

3. Prior to being indicted, the United States Government, with the assistance of the Oglala Sioux Tribe Department of Public Safety investigated a shooting that allegedly occurred between the approach at 20357 BIA 2 and the residence of George Dull Knife on August 5, 2020.

4. As part of the investigation, officers from Oglala Sioux Tribe Department of Public Safety assailed the residence at 20357 BIA 2 at approximately 9:45 p.m. with weapons at the ready.

5. Officer Kevin Klesh entered the residence with the consent of Pitawanakwat at approximately 9:48 p.m. He exited the residence at approximately 10:00 p.m. having determined that no shooting occurred at the residence, and all persons he encountered, including small children, one infant, and one toddler, were calm. There were no visible weapons and no blood.

6. Upon exiting the home, Officer Klesh informed Pitawanakwat that he and the other officers would leave the immediate vicinity of the residence and station their vehicles at or near the end of the approach/driveway near BIA 2.

7. After removing themselves from the immediate vicinity of the residence, the police requested permission to search the property. Ms. Pitawanakwat enforced her

constitutional rights to require a search warrant. Application was then made for a search warrant.

8. At approximately 12:30 a.m. on August 6, Oglala Sioux Tribe Department of Public Safety Criminal Investigator Derek Puckett ("Puckett") interviewed Ms. Pitawanakwat.

9. At approximately 12:30 a.m. on August 6, 2020, Investigator Puckett placed Pitawanakwat in his police vehicle. No female officers were present. Pitawanakwat was removed from her ability to nurture her infant child.

10. Puckett never believed Pitawanakwat during her interview. Despite never informing her of her Miranda rights, Puckett thereafter threatened Pitawanakwat that lying to a federal agent was a federal crime.

11. However, Puckett interviewed Waskoness, Pitawanakwat's daughter, four hours later, and when Waskoness provided a similar understanding and knowledge of what occurred, no threats were made.

12. Comparatively, Puckett accommodated Waskoness, allowing her toddler to accompany her during the interview. During this interview, Puckett informed Waskoness that Pitawanakwat could be a suspect.

13. The affidavit for a search warrant submitted by law enforcement admitted that Pitawanakwat was interviewed as a part of this investigation. This interview occurred approximately 3½ to 4 hours after the alleged incident at a time when a primary suspect had been identified but not arrested and prior to the application for a search warrant.

14. Police suspected and tried to pursue George Dull Knife based on a 20-minute interview with KT Burgee who admitted he saw nothing except lights.

15. Despite interviewing Pitawanakwat in connection with a shooting for which suspects were still being identified and subsequently threatening her as a suspect, she was not read her Miranda rights.

16. Additional alleged facts will be developed within the legal argument below, as necessary to develop pertinent timelines from video footage or audio recording, which are impliedly present in the alleged facts stated above.

## ARGUMENT AND AUTHORITY

The police controlled and dominated the situation and property from the moment they, with assault rifles at the ready, assailed the residence occupied by Pitawanakwat at 9:45 p.m. on August 5, until they left some time after daylight on August 6. The Fifth Amendment of the United States Constitution states, "[n]o person shall be . . . compelled in any criminal case to be a witness against [herself] . . . without due process of law." U.S. Const. amend. V. This

> Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. [The United States Supreme Court has] concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored [emphasis added].

*Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966). The first officers on scene identified and communicated an undisturbed environment in which it appeared to them no shooting had occurred. At the outset, police only stated a shooting occurred. However, it was evident to them no shooting occurred at the residence. Thus, any

4

individual any officer encountered or spoke with could reasonably believe to be a suspect, regardless of the words used by the officers.

The key inquiry is whether Pitawanakwat was "in custody" at the time of her interview. "[T]he custody determination focuses on how a reasonable person in the suspect's position would have felt, the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *United States v. Circle Bear*, No. 3: 14-CR-30122-RAL, 2015 U.S. Dist. LEXIS 57771, at *9 (D.S.D. Apr. 30, 2015) (internal quotes and citation omitted). The Eighth Circuit has

> six non-exhaustive factors that are representative of whether an individual is in custody[:] (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of the questioning. *However, the most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.*

*United States v. Ferguson*, No. 5:15-CR-50082-JLV, 2016 U.S. Dist. LEXIS 181443, at *13-14 (D.S.D. June 1, 2016) (internal citations and quotations omitted) (emphasis added).

> Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. Whether [a person] was in custody is not a matter of [her] own subjective belief, but turns on whether a reasonable person in [her] shoes would have felt free to end the interview.

*United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (internal citations omitted). Indeed, "[t]he ultimate decision requires a hard look at all the circumstances[,]" *Id.* at 1140, and is reviewed *de novo*. *Id.* at 1137.

5

The Court must consider whether the situation was dominated by police. Nearly three hours before her interview, the police arrived at her doorpost at 9:45 p.m. without any alleged suspect in custody to investigate a shooting which allegedly occurred somewhere along the driveway between her home and BIA 2 and then remained for the next eight-plus hours. Police dominated the landscape with their presence for over eight hours until a search warrant could be executed on.

Importantly, at the time Officer Klesh was leaving the immediate vicinity of the residence at approximately 10:00 p.m., he communicated to other officers that that no shooting occurred at the residence, and everyone looked calm and normal. Nonetheless, police remained on the property establishing a blockade at the entry/exit point of the property. At some point after 10:00 p.m., police asked for Pitawanakwat's consent to search the property, which she lawfully denied.

Thus, by the time Puckett interviewed Pitawanakwat, police had converted private property for federal purposes. Puckett required Pitawanakwat to be interviewed in his official police vehicle. He immediately controlled all movement and removed her from any "home turf" she may have had. Pitawanakwat was removed from her infant child, not able to provide care in the event it was needed. No female officer was present to assist with the interview. The land was dominated by police presence. Furthermore, the police barricaded the entry/exit point and controlled all access into and out of the property.

During the interview, Puckett did not inform Pitawanakwat that she was not being arrested. He did not inform her that the questioning was voluntary, that she was not considered under arrest, or that she could terminate the interview at will. Puckett did threaten her with charges for lying to a federal agent in order to obtain a confession.

The most severe restriction on freedom of movement is an interview while under arrest or in confinement. *See, United States v. Ollie*, 442 F.3d 1135. The least restrictive being a "Terry Stop" which rarely triggers a Miranda warning. *United States v. Palayo-Ruelas*, 345 F.3d 589, 592 (8CA 2003). Certainly, the Terry Stop exceptions are not at issue in this case, but neither was Pitawanakwat in jail. Rather, these circumstances fall somewhere in between. Nonetheless, it takes all of 5 seconds to inform an individual of their rights and give the Miranda warning. Puckett never told Pitawanakwat she *was not* under arrest. He never told her that she *was* free to terminate the interview. However, when he threatened her with criminal charges for lying to a federal agent, the scope of the interview changed, and he became an inquisitor. At that point, he should have informed her of her rights or terminated the interview. He did neither.

## CONCLUSION

The situation and land were dominated by police. Freedom of movement is one of degree. Certainly, Pitawanakwat could not freely move when she was placed in the police vehicle. Even had she tried to remove herself from the vehicle, she would have stepped into a situation in which her movements were monitored and restrained, despite being at her home and on the land. It is unreasonable to believe the police would let her walk around the property for which they were seeking a search warrant, having predetermined it to be the sight of an alleged crime.

Additionally, once Puckett threatened Pitawanakwat with federal charges for lying to a federal agent, there would have been no alternative but to continue the interview so as to avoid any conduct from being used against her. In this way, she was not free to terminate the interview nor move around to avoid police monitoring and detection. No

reasonable person could think there was freedom of movement when every movement was being watched.

WHEREFORE, Defendant prays this Court for its Order for an evidentiary hearing on this matter or for its Order invalidating the police questioning of Pitawanakwat and suppressing all the evidence derived from her statements.

Dated this 16th day of February 2021.

        **COSTELLO, PORTER, HILL, HEISTERKAMP, BUSHNELL & CARPENTER, LLP**

        By: _/s/ Jonathan P. McCoy_
            Jonathan P. McCoy
            PO Box 290
            Rapid City, SD  57709
            605-343-2410
            jmccoy@costelloporter.com
            _Attorney for Defendant_