UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | 5:20-CR-50122-JLV-02 |
| Plaintiff, | |
| vs. | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (DOC. NOS. 46 & 47) |
| KIMBERLEE PITAWANAKWAT, | |
| Defendant. | |

---

The United States, by and through Assistant United States Attorney Heather Sazama, files this memorandum in opposition to Defendant Kimberlee Pitawanakwat's Motion and Memorandum in Support of Motion to Suppress Evidence and Statements, filed at Doc. Nos. 46 and 47.

As an initial matter, the defendant's motion to suppress should be denied as facially deficient. She argues generally that all of her statements to Criminal Investigator Derek Puckett should be suppressed but fails to identify the particular statements or the grounds for suppression as to each of her statements, including whether the statement was made in response to a question or was unsolicited. The government submits the defendant's blanket motion and memorandum fall short of what is contemplated under Fed. R. Crim. P. 47 and D.S.D. Crim. LR 47.1(C) and should be denied. Alternatively, the United States requests this Court order the defendant to supplement her motion and require her to identify with particularity the statements she believes are subject to suppression and the grounds therefor.

## FACTUAL BACKGROUND

The United States expects the following relevant facts to be established should the Court conduct an evidentiary hearing on the defendant's motion to suppress.  On August 5, 2020, shortly before 9:10 p.m., George Dull Knife shot Carmen Burgee as she and her son, K.T. Burgee, drove away from the Dull Knife residence located at BIA Road 2, near Potato Creek and approximately 10 miles east of Kyle, South Dakota.  Officers of the Oglala Sioux Tribe Department of Public Safety (OST DPS) made contact with Ms. Burgee and her son, who had called 911 emergency dispatch and reported the shooting.  Officers observed bullet holes, broken glass, and blood inside the Burgee vehicle, a gold- or tan-colored four-door Buick Enclave.  While OST DPS Criminal Investigator Derek Puckett (Puckett) interviewed KT Burgee and processed the Burgee vehicle for evidence, other OST DPS Officers, including Lieutenant Kevin Klesh, responded to the Dull Knife residence.

Lt. Klesh and Officer Daylon Black Bull approached the Dull Knife residence at approximately 9:44 p.m.  The defendant, Kimberlee Pitawanakwat, met them on the front porch in an agitated state.  The defendant and the officers briefly exchanged words on the porch, then the defendant permitted officers to enter.  The defendant subsequently calmed down and appeared cooperative. Inside the residence with the defendant was her daughter, Waskoness Pitawanakwat, and three minor children.  The defendant and the officers conversed for a number of minutes about the reported shooting and other topics.

2

Lt. Klesh observed no indication that any violence had occurred inside the residence and telephoned OST DPS dispatch to report the same. Lt. Klesh advised the defendant that Puckett would be arriving at the residence and hoped to speak to her about the shooting. The defendant indicated Puckett was welcome to approach the house to speak with her.

Lt. Klesh and Officer Black Bull were inside the residence for less than twenty minutes. As they departed, the defendant acknowledged her understanding the officers were just doing their jobs and told them to "be safe out there." The shooting suspect, George Dull Knife, remained unaccounted for and the defendant told officers she had not seen him for five days. Lt. Klesh advised the defendant the officers would leave the immediate vicinity of the Dull Knife residence and would gather at the end of the approach to the property to secure the scene. After approximately an hour had passed, the defendant told Lt. Klesh she needed to get some sleep. Lt. Klesh described her demeanor at that time as impatient. The defendant also told Lt. Klesh she had had a confrontation with KT Burgee and Carmen Burgee earlier on the night of August 5. The defendant was not then, and is not now, suspected of shooting Carmen Burgee.

Puckett and OST DPS Criminal Investigator Jonathan Archambeau arrived at the Dull Knife residence at approximately 12:22 a.m. Puckett interviewed the defendant inside his patrol unit beginning at 12:32 a.m. The defendant's movement was wholly unrestrained during her conversation with Puckett. She

3

was not handcuffed, nor was she placed in the backseat cage of Puckett's vehicle. The defendant was not "placed" in Puckett's vehicle at all.  Instead, when Puckett asked the defendant, "Stormy, can I get you to jump in real quick, on this side?" the defendant voluntarily acquiesced.  Puckett did not display a weapon of any kind, nor did he lock the doors or tell the defendant she was not free to leave. Puckett had no weapon displayed, and the defendant was not ordered to do anything.  Puckett introduced himself and asked the defendant what she could tell him about what had happened and who had been at the residence on the night of August 5.  The defendant spoke with Puckett for just short of forty minutes.  She gave statements in response to direct questioning as well as unsolicited statements.  She asked questions and was assertive.  Near the conclusion of their conversation, the defendant told Puckett everyone else in the Dull Knife residence was asleep, but she had been waiting up because she had been told Puckett wanted to speak with her.

Puckett used no strong-arm tactics or deception with the defendant.  When the defendant adamantly denied a shooting had taken place on the property, Puckett told her he knew someone had been shot.  He did not raise his voice or become confrontational.  When Puckett advised the defendant she could be charged with a crime if she lied to him, the defendant forcefully denied she was lying and accused Puckett of threatening her.  Puckett's calm response was, "I'm not threatening you, I'm just telling you, because somebody got shot."  During

4

the interview, the defendant told Puckett, "I understand what my rights are.  I understand what's going on."

No officers stood guard outside Puckett's vehicle, and the defendant was not arrested at the end of the conversation.  Instead, Puckett handed the defendant his business card and asked her to call him if she thought of any information that might be helpful to the investigation.  He also told her the investigating officers were trying to speak to as many people as possible and thanked her for her information.  Puckett explained to the defendant he and the other officers would be on the scene for as long as it took to obtain a search warrant for the property, and the defendant asked, "So do I have to sit here the whole time?"  Puckett responded, "No, no.  We're done here.  Um, like I said, you've got my phone number, if you hear anything about it, give me a call."  The defendant told him, "Alright then.  Well, you have a good night."  Puckett apologized for bothering the defendant and her family, and the defendant exited Puckett's vehicle.  The defendant was not arrested until November 2020.

After Puckett concluded his interview of the defendant, Lt. Klesh asked the defendant if she would sign a written consent form permitting officers to search the residence and premises.  The defendant declined, so Puckett sought and obtained a search warrant at approximately 3:43 a.m.  Officers executed the search warrant beginning at approximately 4:14 a.m.

5

## AUTHORITY AND ARGUMENT

### A. Miranda v. Arizona has no application to the defendant's interview on August 6, 2020, because the defendant was not in custody.

The protections of *Miranda v. Arizona* "are triggered only when a Defendant is in custody and being interrogated." *United States v. Nguyen*, 608 F.3d 368, 374 (8th Cir. 2010); *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005); *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). The Supreme Court has defined "custodial interrogation" as questioning by police "after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002). In assessing whether a person is "in custody," courts examine the totality of the circumstances, as well as "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation 'in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody.' " *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)); *see also United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012) and *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006).

The Eighth Circuit has identified six non-exhaustive indicia for determining whether a suspect is in custody:

(1) whether police told the suspect "that the questioning was voluntary," the suspect could leave or ask the officers to do so, "or

6

that the suspect was not considered under arrest"; (2) whether the suspect's movement was restrained during the questioning; (3) "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions"; (4) whether police used "strong arm tactics or deceptive stratagems" during questioning; (5) "whether the atmosphere of the questioning was police dominated"; and (6) whether the suspect was arrested at the end of the questioning.

*Griffin*, 922 F.2d at 1349. The Court' primary focus when applying the indicia factors to the facts of a particular case is the "suspect's subjective belief that '[her] freedom of action is curtailed to a degree associated with formal arrest' and whether that belief is objectively reasonable under the circumstances." *Id.* (quoting *Berkemer*, 468 U.S. at 439).

In *United States v. Martinez*, the Eighth Circuit explained, "the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." *Martinez*, 462 F.3d at 909 (quoting *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (internal quotation marks omitted)). In that case, Martinez was detained by two officers, patted down for weapons, and closely questioned about specific criminal acts they suspected him of committing. *Id.* Prior to his questioning by the two officers, Martinez was handcuffed and told he was not free to leave. *Id.* The totality of the circumstances led the court to conclude that a reasonable person would not feel at liberty to stop the questioning and leave.

Likewise, the Eighth Circuit found the defendant in *United States v. Cowan* was in custody because the totality of the circumstances established that a

reasonable person would not feel free to end police questioning and leave the scene. *Cowan*, 674 F.3d at 957. Cowan was detained, handcuffed, and patted down while being questioned by a police detective investigating crack cocaine trafficking. *Id.* at 951. The detective removed Cowan's wallet and keys from Cowan's clothes pockets. *Id.* The detective removed Cowan from an apartment to the parking lot of the apartment building and told Cowan he could leave if the keys the detective removed from Cowan's pocket did not belong to any cars in the lot. *Id.* The keys were matched to a car and officers brought a drug dog to the scene. *Id.* Cowan did not volunteer to answer questions, nor was he told he was free to leave. After the drug dog alerted to Cowan's vehicle and crack cocaine was found in it, Cowan was then Mirandized and confessed to drug trafficking activities. *Id.* at 951-52. Under those circumstances, Cowan was found to have been in custody when he incriminated himself. *Id.* at 957-58.

The circumstances in *Martinez* and *Cowan* are unlike those in the instant case. The facts surrounding the defendant's interview with Puckett establish that even if the defendant claims a subjective belief that she was not free to end questioning and leave Puckett's vehicle, such a belief was not reasonable under the totality of the circumstances. *See Griffin*, 922 F.2d at 1349. The defendant accepted an invitation to sit in Puckett's vehicle and willingly answered questions, even indicating she had stayed awake in order to be able to speak with Puckett. She remained unrestrained for the duration of the interview. No deception or misinformation tactics were used against her, nor did Puckett

become combative or raise his voice to her.  The atmosphere of the questioning was calm and conversational.  No weapons were displayed, no threats were made, and the defendant was told she was free to leave.  The defendant was not arrested following the interview.

Because the defendant was not in custody when she spoke with Puckett, no *Miranda* warnings were required, even if she was interrogated.  *See, e.g., United States v. Running*, 698 F.Supp.2d 1186, 1193 (D.S.D. 2009) (concluding that "[b]ecause the interrogation was not custodial, there was no requirement that Defendant be advised of his *Miranda* rights").  The United States Supreme Court and the Eighth Circuit have soundly rejected the notion that *Miranda* applies to noncustodial police interviews of suspects:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it…. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."  It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Thatsaphone v. Weber*, 137 F.3d 1041, 1044–45 (8th Cir. 1998) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977)).

## B. Even if the defendant's statements are subject to suppression, the defendant's statements are admissible for an alternative purpose.

In the event the Court determines the defendant's statements are inadmissible in the government's case-in-chief, the evidence will show the

statements were neither involuntary nor coerced.  *See Mincey v. Arizona*, 437 U.S. 385, 398-402 (1978).  The statements are therefore admissible at trial for impeachment purposes.  *See Oregon v. Hass*, 420 U.S. 714, 720-24 (1975); *Harris v. New York*, 401 U.S. 222, 223-26 (1971); *see also Michigan v. Harvey*, 494 U.S. 344, 348-54 (1990) (overturning state court ruling that because the defendant's statement after arraignment and appointment of counsel was taken "in violation of [his] Sixth Amendment right to counsel" it could not be used for impeachment purposes); *United States v. Red Bird*, 146 F. Supp. 2d 993, 1003, 1009 (D.S.D. 2001) (holdin the defendant's statements, although elicited in violation of the Sixth Amendment right to counsel, were admissible to impeach his trial testimony).  Here, the defendant's statements were not extracted by violence, threats, or any express or implied promises that were sufficient to overbear her will or critically impair her capacity for self-determination.  *See Lebrun*, 363 F.3d at 724.  Even if the defendant's statements are inadmissible in the government's case-in-chief, they are admissible for other purposes, such as impeachment, in the event she testifies at trial.

## CONCLUSION

Based on the foregoing argument and authority, the United States requests the Defendant's Motion to Suppress Evidence and Statements be denied in its entirety.

Dated this 22nd day of February, 2021.

RONALD A. PARSONS, JR.
United States Attorney


*/s/ Heather Sazama*
_____

HEATHER SAZAMA
Assistant United States Attorney
201 Federal Bldg., 515 Ninth Street
Rapid City, SD 57701
Telephone: 605-342-7822
Facsimile: 605-342-1108
E-Mail: Heather.Sazama @usdoj.gov

11