1           UNITED STATES DISTRICT COURT

2            DISTRICT OF SOUTH DAKOTA

3                WESTERN DIVISION
   * * * * * * * * * * * * * * * *    * * * * * * * * * *
4  UNITED STATES OF AMERICA,         * CR No. 20-50122-2
                      Plaintiff,     *
5                                    * EVIDENTIARY HEARING
      vs.                            *
6                                    * April 9, 2021
   KIMBERLEE PITAWANAKWAT,           *
7                     Defendant.     *
   * * * * * * * * * * * * * * * *    * * * * * * * * * *

8

9          REDACTED TRANSCRIPT OF EVIDENTIARY HEARING

10       BEFORE THE HONORABLE DANETA WOLLMANN,

11            US DISTRICT COURT MAGISTRATE

12  APPEARANCES:

13  FOR THE PLAINTIFF:   BENJAMIN PATTERSON
                         U.S. Attorney's Office (Rapid City)
14                       515 Ninth Street, Room 201
                         Rapid City, SD, 57701
15                       (605) 343-5110
                         Ben.Patterson@usdoj.gov
16
    FOR THE DEFENDANT:   JONATHAN P. McCOY
17                       COSTELLO PORTER HILL HEISTERKAMP
                         BUSHNELL & CARPENTER, LLP
18                       704 St. Joseph Street
                         Rapid City, SD, 57709
19                       (605) 343-2410
                         jmccoy@costelloporter.com
20

21  COURT REPORTER:      SHERI L. NOT HELP HIM, RPR, CRR
                         Official Court Reporter
22                       550 Ninth Street, #302
                         Rapid City, South Dakota 57701
23                       Phone: (605) 399-6007.
                         Sheri_Nothelphim@sdd.uscourts.gov
24

25

1                           I N D E X

2
                                                        PAGE
3
   **LIEUTENANT KEVIN KLESH**                              5
4  Direct Examination by MR. PATTERSON                   5
   Cross-Examination by MR. McCOY                       18
5  Redirect Examination by MR. PATTERSON                29

6  **CRIMINAL INVESTIGATOR DEREK PUCKETT**               30
   Direct Examination by MR. PATTERSON                  30
7  Cross-Examination by MR. McCOY                       45
   Redirect Examination by MR. PATTERSON                60
8

9

10                        E X H I B I T S

11  NO.        DESCRIPTION                      ADMITTED

12     1  -  Recording of Interview                  38

13     2  -  Body Camera Video                       15

14     3  -  Transcription of Recorded              39
              Interview
15

16

17

18

19

20

21

22

23

24

25

```
 1                PROCEEDINGS ~ April 9, 2021
 2              Before Hon. DANETA WOLLMANN, Judge
 3
 4         (Proceedings in open court at 1:03 p.m.)
 5         THE COURT:  All right, good afternoon.  This is
 6    in the matter of the United States of America versus
 7    Kimberlee Pitawanakwat, it's currently file number
 8    20-50122.
 9              Counsel, would you note your appearances for the
10    record?
11              MR. PATTERSON:  Your Honor, Benjamin Patterson
12    on behalf of the United States.
13              MR. McCOY:  And Jonathan McCoy on behalf of
14    Kimberlee Pitawanakwat.
15              THE COURT:  All right.  Ms. Pitawanakwat, are
16    you able to see and hear me all right?
17              THE DEFENDANT:  That's correct, Your Honor.
18              THE COURT:  All right.  Well, I did note that
19    you did sign and file a written waiver of personal
20    appearance.  It's my understanding that you are in Oregon
21    and it was quite a distance for you to travel, and so your
22    attorney had requested that you be allowed to appear by
23    video conference.  And assuming that you consented, which
24    you have, that is fine with me.
25              Is that still how you're wanting to proceed?
```

```
1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Okay.  Well, here's what we're going

3    to do.  If you need to visit with your attorney at all,

4    obviously that would need to be confidentially, so just

5    let me know that.  If you'd say, "Excuse me, I'd like to

6    talk to my attorney," what we'll do is we'll take a recess

7    and Mr. McCoy will step out into the hall.  We have one of

8    our witnesses rooms available, a private room, where he

9    can call you.

10             I presume you've made arrangements that you can

11   call each other with phone numbers?

12             MR. McCOY:  Yes, Your Honor.  And I think that

13   the way that we've agreed to handle that is  that she has

14   my phone number and can text.  And Amy Walters from my

15   office is here as a paralegal today, and she will monitor

16   that.  The text message will come, and then I'll make the

17   request.

18             THE COURT:  Okay.  Let's do that.  And if for

19   some reason that communication process breaks down, just

20   feel free, Ms. Pitawanakwat, to say, "Excuse me," and then

21   we'll take a break.  But otherwise you are not allowed to

22   make your own objections or ask your own questions.  It's

23   just simply through your attorney.

24             So this is a time and place for an evidentiary

25   hearing on the defendant's motion to suppress filed at
```

1     document 46.

2              Is there any preliminary matter we need to

3     address before we take testimony today?

4              MR. PATTERSON:  Not from the United States, Your

5     Honor.

6              MR. McCOY:  And no, Your Honor.

7              THE COURT:  Then the government may call its

8     first witness.

9              MR. PATTERSON:  Thank you, Your Honor.  The

10    United States will call Lieutenant Kevin Klesh.

11             THE COURT:  Please come forward to be sworn in.

12    If you will stand up on the witness stand, the clerk will

13    swear you in.

14             MR. PATTERSON:  Your Honor, would it be okay if

15    I remain seated at the table?

16             THE COURT:  That would be fine.

17                    **LIEUTENANT KEVIN KLESH**

18             called as a witness on behalf of the Government

19    herein, was sworn, examined, and testified as follows:

20             **DIRECT EXAMINATION BY THE GOVERNMENT:**

21    Q.  BY MR. PATTERSON:  Will you please state your name

22    for us?

23    A.    Kevin Klesh.

24    Q.    And how are you employed?

25    A.    At the Department of Public Safety.

1    Q.    What position do you hold?

2    A.    I'm Lieutenant of Police.

3    Q.    And how long have you been the Lieutenant of Police?

4    A.    Four years.

5    Q.    What did you do before you became the lieutenant?

6    A.    I was a patrol officer.

7    Q.    And how long, in total, have you been with the

8    Department of Public Safety?

9    A.    Over eight years.

10   Q.    I want to direct your attention to August 5th of

11   2020.  Were you employed as lieutenant at that time?

12   A.    Yes.

13   Q.    On that date did you receive a call from dispatch

14   related to a shots fired call?

15   A.    Yes.

16   Q.    And can you tell us approximately the time of day

17   that that dispatch call came to you?

18   A.    It was later in the afternoon.

19   Q.    Afternoon or evening?

20   A.    Evening.  Around 2130 hours, which -- yeah.

21   Q.    2130 is about 9:30 p.m.?

22   A.    Yes.

23   Q.    Where was the location of the reported shots?

24   A.    It was reported down at the Dull Knife's residence

25   down by Potato Creek.

1    Q.   And you're familiar with that location?

2    A.   Yes.

3    Q.   Did you respond to that location after receiving the

4    dispatch call?

5    A.   Yes.

6    Q.   Were you driving a marked patrol car?

7    A.   Yes.

8    Q.   And were you wearing a uniform similar to what you're

9    wearing here today?

10   A.   Yes.

11   Q.   It identified you as a law enforcement officer?

12   A.   Yes, sir.

13   Q.   Can you tell us -- well, how was it that you got from

14   wherever you were to the location?  How did you arrive

15   there?

16   A.   I ran code with my sirens and lights on.

17   Q.   Okay.  And why was that?

18   A.   Get there as soon as possible, due to not -- the

19   suspect at large, not knowing where he was at.

20   Q.   And when you arrived at that residence, how did you

21   approach the home?

22   A.   I approached the home with one of my other officers,

23   light -- using my floodlights and whatnot.

24   Q.   Okay.  And when you have got -- what's the distance,

25   if you know -- is the house right on the road or is it off

1    the road a distance?

2    A.    Probably a quarter mile off the road.

3    Q.    So did you drive up the road to the house?

4    A.    Yes.

5    Q.    When you got there and you put your vehicle in park

6    and got out, explain to us how you -- well, explain to us

7    what you did as you arrived there?

8    A.    Well, the minute I stopped my patrol unit at the

9    front of the trailer, I already observed a female coming

10   out of the residence.

11   Q.    Okay.  And what did you do at that point?

12   A.    I got out of my unit and advised why I was there.

13   Q.    Okay.  Did you have anything with you when you got

14   out of your unit?

15   A.    I had my AR-15, yes.

16   Q.    Why?

17   A.    Because it was an active shooter, and the call that I

18   was responding to, and the suspect was not in custody.

19   Q.    Is that -- based on your training and experience is

20   that something that you would do in a shots-fired call?

21   A.    Absolutely.  Yes, sir.

22   Q.    Was it a male or female that came out of the

23   residence as you arrived?

24   A.    It was a female.

25   Q.    And do you recall who that was?

1    A.    Yes.

2    Q.    Who was it?

3    A.    Her name was Stormy.  I have trouble with the last

4    name.

5    Q.    Okay.  If I told you Pitawanakwat, does that sound

6    familiar?

7    A.    That would be correct.

8    Q.    Do you see that individual participating in this

9    hearing today that you spoke with?

10   A.    Yes, I do.

11   Q.    And can you identify which individual you're talking

12   about?

13   A.    She's wearing a pink shirt, long black hair, and a

14   black mask.

15   Q.    Okay.  Participating virtually with us here today?

16   A.    Yes, sir.

17         MR. PATTERSON:  Your Honor, may the record

18   reflect identification of the defendant?

19         THE COURT:  The record shall so reflect.

20   Q.    BY MR. PATTERSON:  Can you explain to us, lieutenant,

21   what the defendant's demeanor was like as she came out of

22   that residence?

23   A.    Her demeanor was irate, loud voice.

24   Q.    Okay.  Let me ask you a little bit about that.  Was

25   she screaming at you, or what was she doing?

A.    Just irate, very upset that we were there, and
explained that she had children inside and pretty much
that it was uncalled for that we were there.

Q.    Okay.  Did you explain to her the purpose of you
being there?

A.    Yes.

Q.    And what did you do at that point?

A.    I explained to her the purpose, that there was a
shooting involved incident reported to be there.

Q.    Okay.

A.    And my purpose there was to protect and serve, make
sure the suspect was no longer there, for their safety as
well as mine and everybody else's.

Q.    What did you do?  Did you request anything of her at
that time?

A.    I requested that she allow me inside to secure the
residence.

Q.    And what was her response to your request?

A.    She allowed me in, yes.

Q.    And did you detain the defendant during the time in
which you went into her residence?

A.    No.

Q.    Did you place her in handcuffs?

A.    No.

Q.    What was she doing as you went inside of that

1    residence?

2    A.    She was carrying a baby and talking about one of her

3    dogs were dying in the bathroom.

4    Q.    Did you restrict in any way her ability to move about

5    the house?

6    A.    No.

7    Q.    What was her behavior and demeanor like as you

8    entered that home?

9    A.    It was more subtle.  She became cooperative with me.

10   She understood why I was there, and her demeanor became

11   pleasant.

12   Q.    Now lieutenant, you indicated that when you arrived

13   at that location, got out of your vehicle, you had your

14   AR-15 rifle with you.  Obviously that was displayed?

15   A.    Yes.

16   Q.    And did you ever point that at either the defendant

17   or anybody else in that residence during the time in which

18   you were inside?

19   A.    No.

20   Q.    Did you point it at anybody while you were outside?

21   A.    No.

22   Q.    As you were in that residence, were there times that

23   you used your phone to call dispatch?

24   A.    Yes.

25   Q.    What was the purpose of that?

A.    To explain the situation; that from my findings, I
was unable to locate the suspect, and it didn't appear
that there was an active shooting inside that residence,
no blood and such on the floor.

Q.    Okay.  And that was just based on your initial
observations going in and out of that house?

A.    Yes.

Q.    Did you also speak with criminal investigator Derek
Puckett?

A.    Yes.

Q.    And what was your purpose in speaking with him?

A.    I advised him of the same with dispatch, that I
didn't find any reason to believe that the shooting took
place inside that residence.

Q.    Now when you were speaking with the defendant, did
you ask her any questions about other individuals who may
have been at that residence before you arrived?

A.    Yes.

Q.    And what information did you learn there?

A.    I learned that a gold car arrived with two
individuals in it.  And that that gold car had left.

Q.    Okay.  And did you report that information to
dispatch?

A.    Yes, I did.

Q.    And did you receive information back related to that

1    vehicle and the investigation that was ongoing?

2    A.    I received information -- yes.

3    Q.    What was that?

4    A.    Dispatch advised me that the reported vehicle, along

5    with the reported victims, were stopped.

6    Q.    Okay.

7    A.    And that it was the correct vehicle.

8    Q.    Okay.  At some point did you leave the home and walk

9    back outside?

10   A.    Yes.

11   Q.    And what conversation, if any, did you have with the

12   defendant as you were leaving that residence?

13   A.    I thanked her for her cooperation and also apologized

14   for giving her a fright.

15   Q.    Did you ask her whether or not or tell her anything

16   with regards to an investigator coming to that residence?

17   A.    Yes.

18   Q.    And what was that?

19   A.    I advised that an investigator would be here as soon

20   as possible to talk to her.

21   Q.    Now what was her response to you as you told her you

22   would be leaving the residence, that you were sorry for --

23   I think in your words "causing a fright," and those types

24   of things?

25   A.    I believe she said she understood, thank you, and be

1    safe.

2    Q.   All right.

3            MR. PATTERSON:   Your Honor, may I approach the

4    witness?

5            THE COURT:   You may.

6    Q.   BY MR. PATTERSON:   Lieutenant, I've handed you what's

7    been marked as Exhibit 2.   Do you recognize that?

8    A.   I do.

9    Q.   And what is that?

10   A.   That's the video coverage that was recorded on my

11   body camera.

12   Q.   And you were wearing a body camera on August 5th?

13   A.   Yes.

14   Q.   And you've indicated that's what's recorded on that

15   disk.   Is that correct?

16   A.   Yes.

17   Q.   And have you had an opportunity to review that disk?

18   A.   Yes.

19   Q.   And how do you know that that is what's contained on

20   that disk?

21   A.   Because I've watched it.

22   Q.   And did you also initial it?

23   A.   I did.

24   Q.   And based on your review of that video, does it

25   accurately reflect your actions and interactions with the

1  defendant outside her residence on that evening?

2  A.  Yes.

3      MR. PATTERSON:  Your Honor, I would offer

4  Exhibit 2.

5      THE COURT:  Any objection?

6      MR. McCOY:  No objection, Your Honor.

7      THE COURT:  Exhibit 2 will be received into

8  evidence.

9      (Exhibit No. 2 was admitted.)

10  Q.  BY MR. PATTERSON:  Lieutenant, at some point that

11  evening did you ask the defendant for consent to search

12  her residence and property?

13  A.  Yes.

14  Q.  And what was her response to your request?

15  A.  No.

16  Q.  What did you do at that point?

17  A.  At that time I advised her that a search warrant

18  would be requested.

19  Q.  Okay.  Now, did you stay at the residence while

20  waiting for a search warrant?

21  A.  No.  I didn't stay inside the residence.

22  Q.  What did you do?

23  A.  I secured the area outside.

24  Q.  And was it several hours before you were granted a

25  search warrant?

1    A.    Yes.

2    Q.    And why not leave and come back after you have the

3    warrant?

4    A.    Because I didn't want the crime scene tainted in any

5    way.

6    Q.    Is that the usual protocol when securing a scene?

7    A.    Yes.

8    Q.    At some point did criminal investigator Derek Puckett

9    arrive at the location?

10   A.    Yes.

11   Q.    And once he arrived there, what did you do?

12   A.    I briefed him on the situation.

13   Q.    Did you have any contact with the defendant after --

14   A.    Yes.  I briefed him on the situation and went on

15   ahead.  I was supposed to knock on the bedroom window as

16   far as Stormy's instructions.  She wanted me to knock on

17   the bedroom window to wake her up.

18              And I knocked on the bedroom window and she came

19   out, and I introduced the two.

20   Q.    Okay.  Lieutenant, did you ever tell the defendant

21   that she was required to speak to law enforcement?

22   A.    No.

23   Q.    Did the defendant ever tell you that she was

24   unwilling to speak to Investigator Puckett at the time you

25   told her an investigator would like to speak with her?

1   A.   No.

2   Q.   At any point while you were there up to the time in

3   which Investigator Puckett arrived, did you ever at any

4   point detain or arrest the defendant?

5   A.   No.

6   Q.   While she was being interviewed by Investigator

7   Puckett, what were you doing?

8   A.   Still securing the scene.

9   Q.   And based on your observations and understanding

10  about what was going on there, were either you or other

11  officers standing guard or outside the vehicle in which

12  Investigator Puckett was conducting his interview?

13  A.   No.

14  Q.   Based on your knowledge and communication with the

15  defendant, did she ever request that a female officer come

16  to the scene?

17  A.   No.

18  Q.   Did she ever complain to you about the law

19  enforcement presence at her residence?

20  A.   No.

21          MR. PATTERSON:  May I have just a moment, Your

22  Honor?

23          THE COURT:  Of course.

24          MR. PATTERSON:  Thank you.  I have no further

25  questions at this time.

```
 1            THE COURT:  Cross-examination, Mr. McCoy?
 2            CROSS-EXAMINATION BY THE DEFENSE:
 3            MR. McCOY:  Yes, Your Honor, thank you.  And
 4    will it be okay with the Court if I stay seated at the
 5    table as well?
 6            THE COURT:  Of course.
 7    Q.   BY MR. McCOY:  Good afternoon, Lieutenant Klesh.  I'm
 8    Jonathan McCoy.  I'm representing Kimberlee Pitawanakwat.
 9    And I have a few questions for you here today?
10            Now, you said you reviewed your video of the
11    bodycam, and I just want to make sure that you still say
12    the same.  Did you watch that before today?
13    A.   Yes.
14    Q.   Now you arrived at the property, XXXXXXXXXXXX.  Is
15    that your understanding of what the property is?  The
16    address of the property, anyway?
17    A.   I don't know the address.  But if it was down by
18    Potato Creek and the Dull Knife's residence, yes.
19    Q.   Okay.  And you got there approximately 9:40 p.m.?
20    A.   Yeah.
21    Q.   On August 5th of 2020?
22    A.   I believe so.
23    Q.   And you had said that you arrived with your assault
24    rifle, your AR-15, prepared as well.  Right?
25    A.   Yes.
```

1    Q.    And you were there with I believe it was Officer

2    Black, Black Bull?

3    A.    Yes, sir.

4    Q.    And did you stop ahead of time to prepare for the

5    approach to the residence and place on body armor and

6    prepare your assault rifles?

7    A.    Yes.

8    Q.    And what was the reason for that?

9    A.    Because it was an active shooter call, and the

10   suspect was still at large.

11   Q.    And then you approached the residence once you got

12   everything -- once you got your body armor and rifle

13   prepared?

14   A.    Yes.

15   Q.    And were you and Officer Black Bull in the same

16   vehicle?

17   A.    No.

18   Q.    Who was the lead vehicle?

19   A.    The lead vehicle was myself, once I got there.

20   Q.    What do you mean by once you got there?

21   A.    I advised the other officer to stand by, due to the

22   nature of the call, till I got there.  I was only a minute

23   or two away.  Due to the active shooter call, I wanted to

24   be there to assist.

25   Q.    And was Officer Black Bull in his own vehicle with

1   any other -- any other officers?

2   A.   No.

3   Q.   So it was just Officer Black Bull in a separate

4   vehicle following you?

5   A.   Yes.

6   Q.   And then when you approached the residence, how did

7   you approach?

8   A.   I approached with my floodlights and my spotlight on

9   to secure the windows and make sure that the residence was

10  lit up.

11  Q.   I guess when you were on the main highway, describe

12  the entryway.  I guess isn't there two entryways on to the

13  Dull Knife road or drive?

14  A.   I'm uncertain of that.

15  Q.   But you did drive from the highway -- you entered the

16  driveway.  Right?

17  A.   I entered the driveway, the one that I knew of, yes.

18  Q.   And then drove through to the residence?

19  A.   Yes, sir.

20  Q.   And when you received the call, didn't you receive a

21  call from dispatch regarding the shooting incident?

22  A.   Yes.

23  Q.   And at the time that you received the call, were you

24  informed that it was -- that it involved a shooting of

25  another vehicle?

1    A.    I was informed -- no.  Could you reclarify that?

2    Q.    Yeah.  When dispatch called you, did they -- they

3    gave you the details that they knew of the shooting

4    incident; that it involved shooting of a Buick Enclave, I

5    believe is what the vehicle type is?

6    A.    Yes.

7    Q.    And they said that -- and it was your understanding

8    then that at the time that that call came to you, that it

9    involved that Buick Enclave but not the residence?

10   A.    Yes.

11   Q.    Now when you reached the residence, did you look at

12   any of the property, the outside property surrounding it

13   that was in plain view?

14   A.    Yes.

15   Q.    Did you observe any vehicles?

16   A.    I observed a few different vehicles on -- around the

17   trailer.

18   Q.    And do you remember what kind of vehicles those were?

19   A.    No.

20   Q.    Do you remember whether they were light or dark

21   colored?

22   A.    I remember -- no, I don't remember.

23   Q.    Do you remember whether there were any horse trailers

24   present?

25   A.    Yes.  There was a horse trailer present.

1   Q.   And was it connected to any other vehicle?

2   A.   Yes.

3   Q.   What kind of vehicle was it connected to?

4   A.   I don't recall.

5   Q.   Now when you received the call from dispatch, you

6   arrived -- I'm going, I guess, back up?

7        You arrived at the house about 9:40.

8   A.   Yes.

9   Q.   And then prior to that you had stopped to put on your

10  body armor for a few minutes and prepare your assault

11  rifle?

12  A.   Yes.

13  Q.   And it was even prior to that that you received the

14  call from dispatch that there was a shooting incident?

15  A.   Could you clarify that a little more?

16  Q.   I guess prior to putting on your body armor and

17  preparing your assault rifle, you had been advised,

18  notified, whatever, through dispatch that there was an

19  alleged shooting incident?

20  A.   Yes.

21  Q.   And then it took you a few minutes to catch up to

22  Officer Black Bull to --

23  A.   Yes.

24  Q.   -- put on your body armor?

25  A.   Yes.

1    Q.    Would you say it was fair -- or say that it took

2    probably 20 minutes from the time that you were notified

3    to the time that you arrived at the residence?  I can

4    rephrase.  I'll make that a more clear question.

5              Would it be fair to say that it took

6    approximately 20 minutes from the time that you were

7    notified of a shooting incident to the time that you

8    arrived at the Dull Knife residence?

9    A.    No.  I would say I was there a little sooner than

10   within 20 minutes.

11   Q.    Now in preparation for today's hearing -- let me

12   start over.

13             Dispatch keeps a log of all the calls on a

14   command log, don't they?

15   A.    Yes.

16   Q.    Did you review that prior to today's hearing?

17   A.    No.

18             MR. McCOY:  Permission to approach the witness,

19   Your Honor?

20             THE COURT:  You may.

21             MR. McCOY:  I'm showing counsel the discovery,

22   Dull Knife, et al., 0019 through 24 is the command log.

23   Q.    BY MR. McCOY:  Lieutenant Klesh, I'd direct your

24   attention to the page that reads "Dull Knife, et al.,

25   0020" on the bottom right and let you have some time to

1   review that with the various time stamps and text that's

2   on there.

3            Have you had time to review that?

4   A.   Yes, sir.

5   Q.   And your identifier, at least on that night, was

6   4513.  Correct?

7   A.   Yes, sir.

8   Q.   Now as you read that, did you notice any time stamps

9   as to when you would have been advised and identified that

10  you were en route to the scene?

11  A.   Yes.

12  Q.   And what time was that?

13  A.   2114 or something like that.  I was en route at 2116.

14  Sorry.

15  Q.   And so that was actually about 25 minutes, then, from

16  the time that you were advised to the time that you

17  arrived at the Dull Knife residence?

18  A.   Yes.

19  Q.   And you testified that you arrived and approached

20  with the intent to make sure that the suspect was no

21  longer at the residence for the safety of the occupants.

22  Isn't that right?

23  A.   Yes.

24  Q.   That 25 minutes had elapsed from the time that you

25  received the call to the time that you arrived, did you

1   really think that any suspect would -- active shooting

2   suspect would still be there?

3   A.   Due to my experience, yes.

4   Q.   And when you -- you had enough information as well

5   from -- by the time that you arrived that you knew the

6   incident occurred with a Buick Enclave as it was driving

7   away from the residence?

8   A.   Yes.

9   Q.   And that that incident allegedly occurred somewhere

10  between the BIA 2 road, the main highway, and the

11  residence?

12  A.   Yes.

13  Q.   And you drove through that area to get to the

14  residence?

15  A.   Yes.

16  Q.   And then you set up -- after you spoke with

17  Ms. Pitawanakwat, you then set up to secure the area?

18  A.   Yes.

19  Q.   To protect and to keep the crime scene from being

20  obstructed?

21  A.   Yes, being tainted in any way.

22  Q.   Even though you had already driven through it?

23  A.   Yes.

24  Q.   And all this occurred somewhat late in the evening

25  around 10:00?

1    A.    Yes.

2    Q.    Where did you set up your secure perimeter at?

3    A.    Probably 25 yards south of the trailer.

4    Q.    Were you in the main driveway at that point, I guess?

5    A.    Yes.

6    Q.    How familiar are you with the layout of the property?

7    A.    I'm not very familiar with it.  That was my first

8    call at that residence.

9          MR. McCOY:  May I approach the witness, Your

10   Honor?

11         THE COURT:  You may.

12         MR. McCOY:  And for the record, I've shown

13   counsel Dull Knife, et al., 0059.

14   Q.    BY MR. McCOY:  Lieutenant Klesh, it looks like you're

15   reviewing that.  Just let me know when you've had time --

16   A.    Okay.

17   Q.    Okay.  I believe this is a north-south oriented map

18   where north is toward the top of the page.  Would you

19   agree with that?

20   A.    Yes.

21   Q.    And then it appears that the driveway runs to the

22   north and then over to the west.  Would you agree with

23   that?

24   A.    Yes.

25   Q.    And you were stationed to the south of the residence?

A.   Now that I see this, I would like to say that it was on the north side.

Q.   Now the driveway curves coming out of the residence. It goes north and then curves to the west.  Were you in that curve or were you in kind of the straight away after the curve?

A.   I was in that curve.

Q.   And where was Officer Black Bull, if you recall?

A.   He was right there with me.  We had our -- yes.

Q.   Were there any other officers?

A.   No.

Q.   What was the purpose of -- let me rephrase.

It would be my understanding, then, that the purpose of that secure perimeter would be to keep anyone from leaving the residence.  Would you agree with that?

A.   It would be from keeping them -- yeah.

Q.   And then when you set that up after you left the initial engagement with Ms. Pitawanakwat and her family?

A.   Yes.

Q.   After you determined that no shooting or suspects -- correction -- that no shooting appeared to have occurred at the residence?  Is that yes?

A.   Yes.

Q.   And also after you determined that none of the individuals were suspects?

1    A.    Yes.

2    Q.    At this point in time when you set up the perimeter,

3    where would your assessment of the crime scene have been?

4              MR. PATTERSON:   Your Honor, at this point I'm

5    going to object.   This has nothing to do with the motion

6    to suppress.   We're talking about her interview with

7    Investigator Puckett.   We're now exploring all kinds of

8    other things.

9              THE COURT:   Mr. McCoy, your response?

10             MR. McCOY:   I'll strike the question, Your

11   Honor, and move on.

12             THE COURT:   All right.   Thank you.

13             MR. McCOY:   Your Honor, if I could just have a

14   moment; I'll send a quick text, if you don't mind, to my

15   client to make sure she has no questions for me to ask.

16             THE COURT:   Sure.   That's fine.   We'll put on

17   our overhead static in the meantime.

18             MR. McCOY:   Your Honor, I think we're ready.

19             THE COURT:   All right.   Any other questions,

20   Mr. McCoy?

21             MR. McCOY:   Just a couple, actually.

22   Q.    BY MR. McCOY:   Lieutenant Klesh, you had previously

23   testified that Ms. Pitawanakwat didn't complain about law

24   enforcement pressure -- or I'm sorry -- presence.   Would

25   you agree with my recollection of your testimony?

```
 1    A.    Yes.
 2    Q.    Yet she did -- but she did confront -- not really
 3    confront, but she was irritated and complained that you
 4    arrived in the fashion that you did?
 5    A.    Yes.
 6    Q.    But as you said, she did calm down --
 7    A.    Yes.
 8    Q.    -- throughout --
 9    A.    Yes.
10          MR. McCOY:  No further questions, Your Honor.
11          THE COURT:  Redirect, Mr. Patterson?
12          MR. PATTERSON:  Just briefly, Your Honor.
13          REDIRECT EXAMINATION BY THE PROSECUTION:
14    Q.    BY MR. PATTERSON:  Lieutenant, did anybody try to
15    leave the residence while you were there holding the
16    scene?
17    A.    No.
18    Q.    Anybody try to come to the residence while you were
19    there holding the scene, other than law enforcement?
20    A.    No.
21    Q.    Had somebody at that residence told you they needed
22    to be somewhere, would you have assisted them off of the
23    property without tampering or tainting your crime scene
24    that you had held?
25          MR. McCOY:  Objection.  Speculation.
```

```
 1                    THE COURT:  Overruled.

 2                    THE WITNESS:  Yes.

 3                    MR. PATTERSON:  That's all that I have.  Thank

 4       you.

 5                    THE COURT:  Any recross?

 6                    MR. McCOY:  No, Your Honor.

 7                    THE COURT:  You may step down.

 8                    THE WITNESS:  Thank you, Your Honor.

 9                    THE COURT:  The government may call its next

10       witness.

11                    You may return the exhibit that's been entered

12       in to the clerk.  That's the CD.

13                    Your next witness, Mr. Patterson?

14                    MR. PATTERSON:  Thank you, Your Honor.  The

15       United States will call criminal investigator Derek

16       Puckett.

17              CRIMINAL INVESTIGATOR DEREK PUCKETT

18                    called as a witness on behalf of the Government

19       herein, was sworn, examined, and testified as follows:

20                DIRECT EXAMINATION BY THE PROSECUTION:

21       Q.   BY MR. PATTERSON:  Good afternoon.

22       A.   Good afternoon.

23       Q.   Can you state your name, please, for our record?

24       A.   Derek Puckett.

25       Q.   And how are you employed?
```

1   A.   I am an investigator for the Oglala Sioux Tribe
2   Department of Public Safety.
3   Q.   Could you pull that microphone just a little closer
4   to you, please?
5            How long have you been a criminal investigator?
6   A.   A little over a year.
7   Q.   And what did you do before that?
8   A.   I was a patrol officer and a K9 officer.
9   Q.   How long in total have you been with the Department
10  of Public Safety?
11  A.   Over 11 years in law enforcement.
12  Q.   As a criminal investigator, do you wear the same type
13  of uniform you would as a patrol officer?
14  A.   No.
15  Q.   What do you wear?
16  A.   We have a green polo shirt with tan pants.
17  Q.   And does it identify you as a law enforcement
18  officer?
19  A.   Yes.  There is a patch on the left chest area that
20  says Department of Public Safety, Criminal Investigation
21  Division.
22  Q.   Do you also wear a firearm like a normal officer
23  would?
24  A.   Yes.
25  Q.   Do you have a big, old duty belt with all the other

1    stuff attached to it?

2    A.    No.

3    Q.    I want to talk to you about August 5th of 2020, I

4    guess going into the morning of August 6th, 2020.  Do you

5    recall those dates?

6    A.    Yes.

7    Q.    At some point on August 5th of 2020 were you notified

8    by dispatch of a shooting that had occurred?

9    A.    Yes.

10   Q.    And were you working at the time or were you on call?

11   Or how did that call come to you?

12   A.    So I was on the on-call schedule, and I was off duty

13   but subject to call in.

14   Q.    So when you got that call, did you go back on duty?

15   A.    Yes.

16   Q.    And can you tell us what information you were

17   initially provided by dispatch when you went to respond?

18   A.    That there was a shooting at the Dull Knife property

19   between Kyle and Porcupine -- Potato Creek.

20   Q.    Did you respond initially to that location?

21   A.    I started to, then I was advised as I was getting

22   ready that Officer Isaiah Crow did have the Buick Enclave.

23   Q.    And so what did you do then?

24   A.    I went to that vehicle.

25   Q.    And where was that vehicle?

1    A.    It was on Highway 44.

2    Q.    Do you know approximately what the distance would be

3    between the Dull Knife residence and where the vehicle

4    was?

5    A.    Approximately maybe 14 or 15 miles east of the --

6    east of the Dull Knife property.

7    Q.    Okay.  When you arrived at that location where that

8    vehicle was, what observations did you make?

9    A.    There was a broken back window, a hole through the

10   rear passenger headrest, and blood in the front passenger

11   seat.  And then --

12   Q.    Was -- were there any victims there that you were

13   speaking with?

14   A.    Yes.

15   Q.    Who was that?

16   A.    KT Burgee.

17   Q.    And who was -- was there another individual?

18   A.    Yes, Carmen Burgee, but she was not at the scene.

19   She was taken by ambulance to Bennett County Hospital.

20   Q.    And what information, just generally, did you learn

21   as a result of being at that location?

22   A.    So that there -- KT and Carmen came from Pierre,

23   South Dakota, to pick up his girlfriend, Wascones, and his

24   son.  And as he was at the residence --

25   Q.    Let me stop you there.  But did you learn where those

1    individuals were, Wascones and her son?

2    A.   At the Dull Knife property.

3    Q.   Okay.  Keep going, please.

4    A.   So when they got there, Kimberlee walked them away,

5    told him he couldn't be there.  So they -- Wascones told

6    them to come back in an hour, then she'd be ready to go.

7    So they were leaving the property when they started

8    hearing gunshots, and the back window shattered.

9    Q.   Did they indicate whether that occurred on the

10   highway out in front of the residence or what did they

11   indicate?

12   A.   Due to his -- how shook up he was, because his mom

13   got shot, he said it was somewhere between the trailer

14   house and the highway.  He couldn't pinpoint exactly where

15   it was.

16   Q.   So the driveway leading from the highway, leading up

17   to the Dull Knife residence?

18   A.   Yes.

19   Q.   After you finished at that location with the vehicle,

20   what else did you do?

21   A.   I went to the Dull Knife property.

22   Q.   And were you driving a police vehicle?

23   A.   I was driving a department-issued Chevy Silverado,

24   silver in color, with lights and sirens on it.

25   Q.   Do you have a computer and all that stuff inside?

1   A.   No.

2   Q.   When you arrived at the residence, what did you do

3   initially?

4   A.   Got all the information I could with the officers

5   that were there, then requested Kevin Klesh to ask for

6   consent to search her property.  Because he, at that time,

7   had good rapport with the defendant.

8   Q.   And what did you learn about that request?

9   A.   That she said no.

10  Q.   What did you do at that point?

11  A.   Contacted the on-call U.S. Attorney's office and

12  started a search warrant application.

13  Q.   Okay.  At some point did you attempt to speak with

14  the defendant of this case?

15  A.   Yes.  So I had -- again, I had Lieutenant Klesh go up

16  and contact her, because he knew her request like to knock

17  on the window and she would come out, or -- so I sent him

18  up to get her.

19  Q.   And did she come out?

20  A.   Yes, she did.

21  Q.   Did he go, if you know or if you observed, did he go

22  inside the residence to get her?  Or how did that work?

23  A.   I'm not sure how that worked.

24  Q.   At some point did she come out to your vehicle?

25  A.   Yes.

1    Q.    And what did you do at that time?

2    A.    I rolled down the driver's side window where I was

3    sitting, and they were walking from the trailer house.  So

4    I said hello and asked her to get in the passenger seat.

5    Q.    And was it unusual for you to do -- well, why did you

6    do it in your vehicle?  Why have her get in your car?

7    A.    It was dark.  It was cold.  We couldn't do it inside

8    because she denied consent to search.  So that was out the

9    window.

10   Q.    Was it unusual for you to do or conduct an interview

11   in your patrol car?

12   A.    Not at all.

13   Q.    Did you get out and open her door to get her in the

14   vehicle, or how did that work?

15   A.    No.  She walked around the front of my vehicle and

16   got in on her own free will.

17   Q.    Did you ever place her in handcuffs?

18   A.    No.

19   Q.    Did you arrest her at that time?

20   A.    No.

21   Q.    Did you transport her away from her home?

22   A.    No, I did not.

23   Q.    Based on your observations during the course of your

24   interview, was there anybody or any law enforcement

25   officers outside guarding the vehicle or anything like

1    that?

2    A.    Nope.

3    Q.    Who else was in the vehicle besides the two of you?

4    A.    Just us two.

5    Q.    And where did she sit?

6    A.    She sat in the passenger seat.

7    Q.    And did you have her put her seat belt on?

8    A.    Nope.

9    Q.    Did you tell her that she was required to speak with

10   you at any time?

11   A.    Nope.

12   Q.    If she had wanted to leave, what would you have done?

13   A.    Give her a business card and tell her that she could

14   call me whenever she was ready to speak.

15   Q.    Did you lock the doors to your vehicle while you were

16   conducting the interview?

17   A.    Nope.

18   Q.    You indicated previously the uniform for an

19   investigator.  Were you wearing that uniform that evening?

20   A.    Yes.

21   Q.    And did you also have a firearm, your

22   department-issued firearm with you?

23   A.    Yes.

24   Q.    Did you remove that firearm from the holster during

25   the interview at all?

1    A.    No.

2    Q.    Did you ever make reference to it during the

3    interview?

4    A.    Nope.

5    Q.    Are you issued a recording device?

6    A.    Yes.

7    Q.    And did you record your interview with the defendant?

8    A.    Yes.

9    Q.    I'm going to approach and show you what's been marked

10   as Exhibits 1 and 3.  Do you recognize Exhibit 1?

11   A.    Yes.

12   Q.    What is it?

13   A.    That is a digital copy of my interview recording with

14   Kimberlee Pitawanakwat.

15   Q.    And how do you know that that's what's on that disk?

16   A.    I reviewed it and initialed it.

17   Q.    And based on you're review of it, does it appear to

18   be a fair and accurate copy of your recording?

19   A.    Yes.

20         MR. PATTERSON:  Your Honor, I would offer

21   Exhibit 1.

22         MR. McCOY:  No objection.

23         THE COURT:  Exhibit 1 will be received.

24         (Exhibit No. 1 was admitted.)

25   Q.    BY MR. PATTERSON:  And then Investigator Puckett, can

1    you look at Exhibit 3?

2    A.   Yes.

3    Q.   And what is that?

4    A.   This is a transcript of the digital copy of the

5    interview.

6    Q.   And did you **NOTE** **NOTE**?

7    A.   Yes, other than a couple of typos.  Yes.

8    Q.   Thank you.

9         MR. PATTERSON:  Your Honor, I would offer

10   Exhibit 3.

11        MR. McCOY:  No objection.

12        THE COURT:  Exhibit 3 will be received.

13        (Exhibit No. 3 was admitted.)

14   Q.   BY MR. PATTERSON:  Investigator, was the defendant

15   the subject of your investigation when you sat down to

16   speak with her?

17   A.   No.

18   Q.   At any point during the time in which you spent with

19   her in that interview, did she ever become the subject of

20   are your investigation?

21   A.   No.

22   Q.   What was the purpose of interviewing her?

23   A.   Witness who KT identified at the house.

24   Q.   And did you explain to her what that purpose was?

25   A.   Yes.

1    Q.    Can you explain for us what her -- what the

2    defendant's demeanor was like during the course of your

3    interview?

4    A.    She was cordial, polite, didn't raise her voice at

5    all.

6    Q.    Were there times in which she got a little more

7    excited?

8    A.    Yes.

9    Q.    Did she ever scream or yell at you?

10   A.    No.

11   Q.    Did you ever raise your voice during the interview?

12   A.    No.

13   Q.    Did you ever yell at the defendant during the course

14   of your interview?

15   A.    No.

16   Q.    During your interview did the defendant tell you what

17   she did for a living?

18   A.    Yes.

19   Q.    What did she say?

20   A.    She said she was a trade professional, kind of like

21   me but in the firefighting field.

22   Q.    Did she ever tell you during the time that you were

23   speaking with her that she didn't have time for the

24   interview?

25   A.    No.

1    Q.    Do you recall approximately how long your interview

2    lasted?

3    A.    38 to 39 minutes, approximately.

4    Q.    Did the defendant, during the course of your

5    interview wither her, ever tell you that she needed to

6    care for another person instead of talking to you?

7    A.    No.

8    Q.    Did she ever request to leave your interview to go

9    and care for somebody?

10   A.    No.

11   Q.    How about another animal or anything like that?

12   A.    She did say something about an animal dying in her

13   bathtub or -- a dog.

14   Q.    Did she ever request to go out because she was too

15   preoccupied with that situation?

16   A.    No.

17   Q.    Did she tell you what the other individuals in the

18   residence were doing while she was out in the interview

19   with you?

20   A.    Sleeping.

21   Q.    During your interview did you ask her questions or

22   ask questions of the defendant?

23   A.    Yes.

24   Q.    And did she respond to those questions?

25   A.    Yes.

1    Q.   Were there times when the defendant made statements

2    to you that were not in response to any questions?

3    A.   Yes.

4    Q.   At some point in your interview, Investigator, did

5    you tell the defendant that she needed to be honest?

6    A.   Yes.

7    Q.   And why did you tell her that?

8    A.   Because of all the information I had up till when I

9    got the call to that point, she -- it appeared that she

10   wasn't being honest with all the facts that I had.

11   Q.   And what was her response to you telling her that she

12   needed to be honest or tell the truth?

13   A.   She said I was threatening her.

14   Q.   And did she tell you anything else with regards to

15   whether what she had already told you was true or not

16   true?

17   A.   Could you ask that again?

18   Q.   Yeah.  Did she tell you anything -- at the time you

19   asked her to tell the truth, did she say anything about

20   whether what she had told you already was true or not

21   true?

22   A.   Yes.  She said she wasn't lying.

23   Q.   And then she told you that you were threatening her?

24   A.   Yes.

25   Q.   What was your response to that?

1    A.   I told her I wasn't threatening her, I was just

2    warning her.

3    Q.   Okay.  And why were you doing that?

4    A.   Because in the interview she said -- I asked her what

5    the distance was from the house to the highway, and she

6    said she could hear cars coming.  And if somebody's

7    shooting outside your house, you're going to hear

8    gunshots.

9    Q.   Did the defendant change her story after you

10    discussed the consequences of lying to a federal officer?

11    A.   Not at all.

12    Q.   At some point in your interview did you finish asking

13    the defendant questions?

14    A.   Yes.

15    Q.   And what did you tell her at that point?

16    A.   I gave her a business card and said something along

17    the lines of give me a call if you remember something

18    else.

19    Q.   After you did that, did the defendant continue to

20    speak with you even after you had essentially told her

21    your interview was done?

22    A.   Yes.

23    Q.   Is there any requirement that a female be interviewed

24    by a female officer?

25    A.   No.

1    Q.    And based on your time with the defendant, did she

2    ever request that a female officer come to the scene?

3    A.    No.

4    Q.    Did she ever tell you that she felt uncomfortable

5    being interviewed by a male?

6    A.    No.

7    Q.    When you finished your conversation with the

8    defendant, what did or how did it end?

9    A.    She said have a good night, stay safe, and -- she had

10   said have a good night and asked if she -- something along

11   the lines of if we had any more questions for her.

12   Q.    Okay.  Based on you hearing that, what did you think

13   with regards to further questions?

14   A.    She was cooperative; if I had any other questions I

15   could ask her.

16   Q.    Did you arrest her at the end of that interview?

17   A.    No, I did not.

18   Q.    Did she ever tell you during your interview that she

19   either didn't want to answer your questions or a specific

20   question?

21   A.    No.

22   Q.    At any point in your interview did you lie to the

23   defendant to try to get her to make certain statements?

24   A.    No.

25   Q.    Based on your understanding, did anybody try to come

1    to the residence while you were at that location or on the

2    scene?

3    A.    Not that I know of.

4    Q.    And did anybody try to leave the residence while you

5    were there?

6    A.    Not that I observed.

7    Q.    Did the defendant ever tell you that she needed to be

8    somewhere else other than speaking with you?

9    A.    No.

10   Q.    All right.

11         MR. PATTERSON:  Thank you.  That's all the

12   questions that I have.

13         THE COURT:  Thank you, Mr. Patterson.

14         Mr. McCoy, any cross-examination?

15         MR. McCOY:  Yes, Your Honor, thank you.

16         **CROSS-EXAMINATION BY THE DEFENSE:**

17   Q.    BY MR. McCOY:  Good afternoon, Investigator Puckett.

18   A.    Good afternoon.

19   Q.    I'm Jonathan McCoy.  I've got a few questions for

20   you.

21         You interviewed -- and we've been talking

22   about -- or you've been answering questions today about

23   your interview with Ms. Pitawanakwat on August 6th.

24   A.    Yes.

25   Q.    And you're aware that Ms. Pitawanakwat was charged

1   with making false statements to you?

2   A.   Yes.

3   Q.   I know you briefly shared about kind of how you

4   started and got involved in the investigation.  I have a

5   few questions I'd like to ask regarding that.

6           Do you remember about what time you made it to

7   the Buick Enclave?

8   A.   I do not.

9   Q.   Do you remember what time your interview with --

10  well, you interviewed KT Burgee; is that right?

11  A.   Correct.

12  Q.   Do you remember what time that was?

13  A.   I do not.

14  Q.   Does -- but it was before your interview with

15  Ms. Pitawanakwat?

16  A.   Yes.

17  Q.   And then after you took -- or after you interviewed

18  KT Burgee, was it you who took the Buick to the Pine Ridge

19  Justice Center?

20  A.   It was towed there.

21  Q.   Did you follow the tow truck?

22  A.   I did not.  There was an officer that did, though.

23  Q.   What did you do?

24  A.   I went to the Dull Knife property.

25  Q.   And how far in time is that from -- I guess by

1   minutes from where the Buick was at on the side of the

2   road?

3   A.    I have no idea.  You're going to have to show me a

4   command log.

5   Q.    Would your interview, the start time of your

6   interview, be in the command logs, with KT Burgee?

7   A.    No.

8              (Discussion off the record.)

9   Q.    BY MR. McCOY:  What did you do -- I'll start that

10  question over.

11             You testified it was 14 to 15 miles from where

12  the Buick was stopped to the Dull Knife residence.  And

13  did you go straight from there to the Dull Knife

14  residence, you said?

15  A.    Correct.

16  Q.    What did you do once you got to the Dull Knife

17  residence?

18  A.    Briefed with the officers that were on scene.  And

19  like I testified earlier, had Lieutenant Klesh go ask for

20  consent.  When that was a no, then I had to go get

21  Mrs. Pitawanakwat so that I could interview her.

22  Q.    How long would you say that you briefed with the

23  officers on site, including Lieutenant Klesh?

24  A.    I have no idea.

25  Q.    Ten minutes?  20 minutes?  Less than that?

1    A.    I couldn't answer that.

2    Q.    But you know you started your interview with

3    Ms. Pitawanakwat at approximately 12:30 in the morning on

4    August 6th?

5    A.    Correct.

6    Q.    But you don't know how long it took from the time you

7    interviewed KT Burgee and your conversation with the

8    officers before you began that interview?

9    A.    No.

10   Q.    Is that a no?

11   A.    Yeah, that's a no.

12   Q.    And then did you talk with anyone else who was not

13   law enforcement after interviewing KT Burgee?

14   A.    I believe I spoke with FBI Special Agent Kevin

15   Seymore and on-call U.S. Attorney Kathryn Rich about the

16   case.

17   Q.    But no laymen, I guess?

18   A.    No who?

19   Q.    No laymen, no civilians?

20   A.    After KT?

21   Q.    Correct.

22   A.    No.

23   Q.    Did you talk with anyone -- suspect or witness or

24   otherwise but not law enforcement -- prior to KT?

25   A.    Not that I recall.

1    Q.   It's fair to say, then, that at the time that you

2    interviewed Ms. Pitawanakwat, the only individual you had

3    facts from was KT Burgee?

4    A.   Yes.

5    Q.   And at that point in time were you aware of any of KT

6    Burgee's history or character or anything like that?

7            MR. PATTERSON:  Your Honor, I'm going to object

8    again.  This has nothing to do with the suppression and

9    whether her statements to law enforcement were voluntary.

10           THE COURT:  Sustained.

11   Q.   BY MR. McCOY:  Now the facts that you had learned

12   from KT, could they be summarized that there was a black

13   Dodge truck involved?

14   A.   I would say a dark colored, dark, black -- it was

15   dark, so anything looks black at nighttime.

16   Q.   But it was a truck that you'd learned was involved?

17   A.   Yes, from KT.

18   Q.   And then did the gold Buick Enclave look black or

19   dark, since it was nighttime?

20   A.   When I pulled up, it was parked.  So when it's

21   parked, it's different than whenever it's moving.  So if

22   it's parked and your headlights hit it, it's gold.

23   Whereas if it's moving and you pass it on the highway,

24   it's dark colored.

25   Q.   In between the time that you interviewed KT and

1    Ms. Pitawanakwat, were you able to run any motor vehicle

2    checks on black Dodges or George Dull Knife?

3    A.    I did not.

4    Q.    Could you say that again?  I couldn't hear you.

5    A.    I did not.

6    Q.    And based on your interview with KT, it was your

7    knowledge that it was George Dull Knife who was the

8    suspect?

9    A.    Yes.

10    Q.    And that was because of what KT told you?

11    A.    Yes.

12    Q.    Did you run -- or have time to or run other vehicle

13    checks on any of the Dull Knifes, based on TK's

14    information and the black truck?

15              MR. PATTERSON:  Your Honor, I'm going to object

16    as to relevance.

17              THE COURT:  Sustained.

18    Q.    BY MR. McCOY:  Now you said that -- or you testified

19    earlier that all the information you had is what you'd

20    learned from KT?

21    A.    Up to what point?

22    Q.    The point in time that you were interviewing

23    Kimberlee?

24    A.    Oh, from the point I interviewed KT until I started

25    the interview with Kimberlee?  I'm just trying to find a

1    time frame here.

2    Q.   Yes.

3    A.   Yes.

4    Q.   And during her interview, you testified that it

5    appeared to you that she wasn't being honest?

6    A.   Yes.

7    Q.   Now you raised the issue of honesty three times with

8    her.  Does that sound familiar?

9    A.   Not that I -- I guess -- I know it was once when I

10   reviewed my recording.  But if you could point me out the

11   other two, so I could say yes or no to it?

12           MR. McCOY:  Yes.  Permission to approach the

13   witness, Your Honor?

14           THE COURT:  You may.

15           THE WITNESS:  I have a copy of Exhibit 3.

16           MR. McCOY:  Oh, you do?

17   Q.   BY MR. McCOY:  Then in Exhibit 3, I'll have you turn

18   to page 13.  And on page 13, half or so down, it's the

19   first line --

20   A.   Yeah, I see.

21   Q.   -- it says --

22   A.   "Alrighty," it starts with "alrighty."

23   Q.   "Alrighty, so everything up to this point has been

24   completely -- completely honest.  Right?"

25   A.   "Yes."

1  Q.   And you read that correctly?

2  A.   Oh, yes.

3  Q.   And that was in the context, if you look back on page

4  12, of black-colored vehicles.  If you look at the top of

5  page 12 in the section, it starts on page 11 with

6  "Stormy," but it's actually on page 12, the last four-plus

7  lines of that, which is Stormy's statement there.

8  A.   On page 12?

9  Q.   Yeah.  At the top it reads something, there's two --

10  that next set she's talking about black cars.  Would you

11  agree with that?

12  A.   That she's saying something about black cars?  Yes.

13  Q.   Yes.  And is that one of the things that didn't

14  appear to be honest to you?

15  A.   I guess I don't know what to -- could you ask that

16  again?

17  Q.   With the information you had, it appeared that she

18  wasn't being honest.  And the information that you had up

19  to that point was a black Dodge truck.

20  A.   Yeah.

21  Q.   Is that right?

22  A.   Yes.

23  Q.   And this context on page 13 of you questioning her

24  honesty, was because she was referring to a black car, as

25  what I had pointed out on page 12?

1          MR. PATTERSON:  Your Honor, I'm going to object.

2     I think it's very clear from the statement on page 13 that

3     he says, "So everything up to this point has been

4     completely, completely honest.  Right," there's twelve

5     pages before this, not one statement on page 12.

6          THE COURT:  Well, let's have a discussion on the

7     record as far as relevance.

8          Law enforcement officers are allowed to employ

9     all sorts of strategies, even deceptive ones at times.  So

10    what is the relevance of this line of questioning and of

11    in light of the case law?

12         MR. McCOY:  That -- Your Honor, he's been -- he

13    didn't have any reason to believe her truthfulness at this

14    point in time, but there is evidence in the discovery

15    within the command log that shows that a black-colored

16    vehicle -- black-colored car, Chevy Impala, was then put

17    on the be-on-the-lookout list.

18         THE COURT:  Okay.  Well, certainly that would be

19    relevant at trial at the issue of innocence or guilt.  But

20    I'm trying to determine the relevance of that in regards

21    to whether we have a Miranda violation here or if the

22    statements were voluntary, and first and foremost if she

23    was in custody or not.  Those would be the issues raised

24    by the motion to suppress.

25         I mean I try and give the parties liberal

1    abilities to rove into some discovery issues, but it's not

2    a discovery deposition.  We're here to get testimony and

3    evidence on the record as to whether or not

4    Ms. Pitawanakwat was in custody; and then, two, if the

5    statements are voluntary.

6              And if I'm missing an issue here, please let me

7    know.  But those appear to be the two issues framed by the

8    motion, and this appears to be going into a different

9    area.

10             MR. McCOY:  Can I attempt to lay some more

11   foundation, Your Honor?

12             THE COURT:  You may.

13             MR. McCOY:  Thank you, Your Honor.  May I

14   proceed with that at this time?

15             THE COURT:  Well, can you give me a summary?  I

16   don't understand the line of questioning.  And so if you

17   can tell me its relevance, and any response to the

18   government's objection as to relevance, that would help.

19   And then I'll make a ruling. You can do that by proffer.

20             MR. McCOY:  Well, I was going to -- I proffer

21   that he -- that Investigator Puckett had previously

22   testified that he didn't require Ms. Pitawanakwat to speak

23   with him.  But he also didn't tell her that she couldn't

24   speak with him or that she didn't have to speak with him.

25   And so I proffer that that's the next line of questioning,

1    and --

2                THE COURT:  Well, that's certainly relevant.

3    But the question as to whether or not there was a black

4    Enclave or a black vehicle or a gold vehicle has no

5    bearing on whether or not the interview was custodial;

6    and, two, if it was voluntary or not.  And that's the line

7    of questioning that the government was objecting to.

8                If I'm understanding your objection correctly,

9    Mr. Patterson?

10               MR. PATTERSON:  That's correct, Your Honor.

11               THE COURT:  All right.  So you're certainly free

12   to, of course, inquire as to what was said to

13   Ms. Pitawanakwat was accurate in regards to the interview.

14   That line of questioning was certainly relevant, if you

15   would continue with that, please.

16               MR. McCOY:  Thank you, Your Honor.

17   Q.   BY MR. McCOY:  Investigator Puckett, when you began

18   your interview with Ms. Pitawanakwat, did you inform her

19   that she did not have to speak with you?

20   A.   No, I did not.

21   Q.   Looking at page 16 of Exhibit 3, it's your second

22   to -- well, it's your last statement, on page 16.  You say

23   you could get charged with -- sorry.  You could get

24   charged federally for lying to a federal officer.

25               Did I read that correctly?

1    A.    Yes.

2    Q.    And you testified that that was merely a warning?

3    A.    Yes.

4    Q.    Why would you need to issue that warning?

5    A.    Because like I testified, there's -- up to that

6    point, from KT's interview up to that point in their

7    interview, things were adding up.

8    Q.    So if things -- I guess let me restart that question.

9          You issued a warning.  Were you prepared to

10   follow through with that warning at that point in time?

11   A.    No.

12         MR. McCOY:  Your Honor, could I have a few

13   minutes to call Ms. Pitawanakwat this time around?

14         THE COURT:  Sure.

15         You know, why don't we go ahead and take a

16   recess, and we'll reconvene at 2:30.  If you need more

17   time, just let my judicial assistant know that.

18         We'll be in recess until 2:30.

19         (Recess taken.)

20         (Proceedings held in open court.)

21         THE COURT:  Thank you.  Ms. Pitawanakwat, you

22   can be seated as well.

23         All right.  Mr. McCoy, did you have sufficient

24   time to visit with your client during our recess?

25         MR. McCOY:  Yes, Your Honor .  Thank you.

1          THE COURT:  Any further cross-examination?

2          MR. McCOY:  I have just a few questions, I

3     think, Your Honor.

4          THE COURT:  Sure.

5     Q.   BY MR. McCOY:  Investigator Puckett, I'm going to try

6     to find the page here, but do you recall whether

7     Ms. Pitawanakwat said anything about her rights during

8     your interview?

9     A.   Yes.  She stated she understood her rights and

10    understood what I was saying to her, or something along

11    those lines.

12    Q.   You didn't question her as to what she understands to

13    be her rights, though; did you?

14    A.   No.  She offered it up.  I didn't say nothing about

15    it.

16    Q.   But you don't know what rights she was talking about?

17    A.   No.

18    Q.   And you didn't question her about those rights?

19    A.   No.  She was a trade professional, so I figured she

20    knew what she was talking about.

21    Q.   She's a trained firefighter?

22    A.   Yeah.

23    Q.   Not a trained law enforcement officer?

24    A.   Trained professional.

25    Q.   And then it was testified -- well, I guess you said

```
 1    that Ms. Pitawanakwat never asked to talk with a female
 2    officer?
 3    A.    No.
 4    Q.    You never gave her the option to, either, though.
 5    Did you?
 6    A.    She didn't request it.
 7    Q.    But you didn't give her the option?
 8    A.    No.
 9    Q.    And you did not allow her to leave the vehicle?
10    A.    She was free to go any time.  I just didn't say it.
11    Q.    And you testified that the reason you had her in the
12    vehicle was because there was no consent to search the
13    house?
14    A.    No consent.  It was dark and cold out.
15    Q.    It was August 5th.  How cold was it?
16    A.    It was midnight.  So it was cold.  A nice little
17    breeze.  I don't know the exact temperature.
18    Q.    And you're aware that the house had already been
19    searched?  She had already given consent to search the
20    house?
21    A.    Yes.
22    Q.    And you said you had your firearm on you?
23    A.    Yes.
24    Q.    What -- and it was your service-issued firearm?
25    A.    Yes.
```

```
 1    Q.    Was that a yes?

 2    A.    Yes.

 3    Q.    What is your service-issued firearm?

 4    A.    A Glock 40.

 5    Q.    And was that in public display?

 6    A.    It was on my hip in the holster.

 7    Q.    Was the secure strap --

 8    A.    Yes.

 9    Q.    -- around it?

10    A.    Yes.

11    Q.    When you have arrived, and you said it was Lieutenant

12    Klesh who knocked on her window?

13    A.    I don't know what he knocked on, if it was a window.

14    But he had rapport with her, and she gave him special

15    instructions to not wake up the kids.  So he knew what it

16    was, so that's why I sent him in.

17    Q.    And then you went with him up to the porch, or up to

18    the door to greet Ms. Pitawanakwat?

19    A.    Not that I recall.  I believe I stayed in my unit,

20    because I rolled down the window and said hello and asked

21    her to get in on that side.

22          MR. McCOY:  No further questions, Your Honor.

23          THE COURT:  Thank you, Mr. McCoy.

24          Any redirect, Mr. Patterson?

25          MR. PATTERSON:  Very briefly, Your Honor.
```

**REDIRECT EXAMINATION BY THE GOVERNMENT:**

1

2    Q.   BY MR. PATTERSON:  Investigator, is there a

3    difference between a safety sweep and a full-blown search

4    of a residence?

5    A.   Yes.

6    Q.   What's the difference?

7    A.   A safety sweep is just to make sure for officer

8    safety to say if a suspect was in there.  A full-blown

9    search is pulling drawers out, checking under cabinets --

10   Q.   And is that what you did the first time, the safety

11   sweep?

12   A.   Yes.

13   Q.   And you hadn't done a full-blown search?

14   A.   No.

15   Q.   And based on your understanding, did the defendant

16   consent to a full-blown search?

17   A.   No.  She did not.

18   Q.   You talked about your firearm.  What side of your

19   body do you wear your firearm on?

20   A.   My right.

21   Q.   Does your truck have one of those center consoles

22   between the two front seats or --

23   A.   Yeah.

24   Q.   -- is it a bench seat?

25   A.   There's a center console which has my radio, lights,

1   and sirens switches.

2   Q.   So as you're sitting there, is your gun up against

3   that center console?

4   A.   Yeah, between the seat and the center console.

5   Q.   Is it even visible to somebody sitting in the

6   passenger seat?

7   A.   No.

8          MR. PATTERSON:  Thank you.  That's all I have.

9          THE COURT:  Any recross?

10         MR. McCOY:  No, Your Honor.

11         THE COURT:  Thank you.  You may step down.

12         The government may call its next witness.

13         MR. PATTERSON:  Your Honor, the United States

14  has no additional witnesses.

15         THE COURT:  Mr. McCoy, do you have any

16  witnesses?

17         MR. McCOY:  No, Your Honor.  We do not.

18         THE COURT:  You don't have any witnesses?

19         MR. McCOY:  No, Your Honor.

20         THE COURT:  Okay.  Very well.

21         Well, the issues, I think, were properly briefed

22  with the initial filings with the Court.  I think our

23  record is pretty complete.  I don't see a need for any

24  post-hearing briefing.  I don't believe any new topics

25  were raised or addressed.  Unless the parties feel

1   otherwise, I'm not requiring any post-hearing briefings.

2              Mr. Patterson, any objection to that?

3              MR. PATTERSON:  No, Your Honor.  The United

4   States would rest on the record and its initial response.

5              THE COURT:  Any objection from you, Mr. McCoy?

6              MR. McCOY:  No, Your Honor.

7              THE COURT:  Well, we will just work on the

8   record that we have and issue a report and recommendation

9   following the hearing.

10             Anything further that we need to put on the

11  record this afternoon?

12             MR. PATTERSON:  No, Your Honor.  Thank you.

13             MR. McCOY:  No, Your Honor.  Thank you.

14             THE COURT:  Thank you, Ms. Pitawanakwat, for

15  joining us via video.

16             That will conclude this hearing, and so with

17  that we'll be adjourned.

18             THE LAW CLERK:  All rise.

19             (End of proceedings this date at 2:40 p.m.)

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2
     UNITED STATES DISTRICT COURT   )
 3   DISTRICT OF SOUTH DAKOTA       )      SS
     WESTERN DIVISION               )
 4

 5          I, Sheri L. Not Help Him, RPR, CRR, Official

 6   Court Reporter in and for the United States District

 7   Court, District of South Dakota,

 8          DO HEREBY CERTIFY that I acted as such Court

 9   Reporter at the EVIDENTIARY HEARING of the within-entitled

10   action, and that the foregoing redacted transcript, pages

11   1 to 62, inclusive, is a true and complete transcript of

12   my stenographic notes taken at said EVIDENTIARY HEARING on

13   April 9, 2021.

14          Dated at Rapid City, South Dakota, this 11th day

15   of June, 2021.

16                        /s/ Sheri L. Not Help Him

17                        _____
                          SHERI L. NOT HELP HIM
18                        Official Court Reporter
                          515 Ninth Street #302
19                        Rapid City, SD  57701
                          Phone:  (605) 399-6007
20                        Email: Sheri_nothelphim@sdd.uscourts.gov

21

22

23

24

25
```