UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> vs.<br><br>KIMBERLEE PITAWANAKWAT,<br><br>    Defendant. | 5:20-CR-50122-JLV-02<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 46). A hearing was held on Friday, April 9, 2021. Defendant was personally present and represented by her attorney of record, Jonathan McCoy. The Government was represented by the Assistant United States Attorney Ben Patterson. Two witnesses testified at the hearing, and three exhibits were received into evidence. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## JURISDICTION

Defendant is charged in an Indictment with making False Statements in violation of 18 U.S.C. § 1001(a)(2) and Accessory After the Fact in violation of 18 U.S.C. § 3. The pending Motion was referred to the Magistrate Judge

1

pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

At approximately 9:30 p.m. on August 5, 2020, officers with the Oglala Sioux Tribe Department of Public Safety ("OST DPS") received a report of a shooting near the residence of George Dull Knife. Officers first made contact with the victim, Carmen Burgee, and her son, K.T. Burgee. Officers noted the vehicle, a gold or tan Buick Enclave, had several bullet holes and there was broken glass and blood inside the vehicle. While Carmen Burgee was life-flighted to Rapid City, OST DPS Investigator Derrek Puckett stayed and interviewed K.T. Burgee and processed the vehicle for evidence. OST DPS Lieutenant Kevin Klesh and Officer Daylon Black Bull continued to the Dull Knife residence.

Upon arrival, Lt. Klesh and Ofc. Black Bull met the defendant, Ms. Pitawanakwat, in front of the house. They explained to her the reason they were there, and Ms. Pitawanakwat allowed them to enter the home to determine whether anyone was injured or if the shooter was still present. The officers conducted a cursory search of the house and did not find any indications of a shooting. After leaving the house, Lt. Klesh asked Ms. Pitawanakwat for permission to conduct a more thorough search of the home, which she denied. Officers then started the process of obtaining a search warrant for the home, and stationed vehicles at the both ends of the property

on BIA Road 2. Lt. Klesh testified this was standard procedure to secure the scene and that if anyone had requested to leave, they would have been able to.

At around 12:30 a.m., Investigator Puckett arrived at the house and requested an interview with Ms. Pitawanakwat. She agreed to talk with Investigator Puckett and sat in the passenger seat of his cruiser upon his request. Ms. Pitawanakwat let herself into the vehicle, and the doors were not locked. Investigator Puckett testified that if she wanted to leave the vehicle she could have, but he never directly told her that she was free to leave at any time. He was wearing his OST DPS uniform, which consists of a green polo and tan pants. He was also wearing his service firearm, but testified he did not believe it would have been visible during their interaction.

The court, having listened to the audio recording of the interview, finds the tone of the interview to be mostly calm and conversational. Ms. Pitawanakwat got a little bit upset at one point when Investigator Puckett explained to her that she could be federally charged if she was lying to a federal officer. Ex. 1 at 18:46. At that point, she stated "I know what my rights are. I understand what is going on…So you don't need to threaten me with anything.[1]" Id. at 18:50-19:01. The tone then switched back to conversational for the duration of the interview.

During the interview, Ms. Pitawanakwat asked Investigator Puckett numerous questions and sounded comfortable talking with him. On two

---

[1] Earlier in the interview, Ms. Pitawanakwat explained that she has been a wildland firefighter since 2005, and then in 2012 she went to fire academy and became a paramedic and structural firefighter. Ex. 1 at 4:40-4:57.

3

occasions, Investigator Puckett tried to end the interview and Ms. Pitawanakwat continued the conversation by asking additional questions. Id. at 25:27; 30:02.

At the end of the interview, Investigator Puckett gave Ms. Pitawanakwat his card and told her she could call him if she heard anything more about the situation. Id. at 38:03-38:12. She responded by stating "Alright then. Well you have a good night," and he apologized for bothering her all night. Id. Ms. Pitawanakwat then returned to her house. Law enforcement obtained a search warrant around 3:45 a.m. and executed the search around 4:15 a.m.

## DISCUSSION

Ms. Pitawanakwat argues the statements she made on August 6, 2020, to Investigator Puckett should be suppressed because they violate the 4th Amendment to the Constitution. Specifically, she argues she made the statements as part of a custodial interrogation without being first advised of her Miranda rights. (Doc. 47).

The Government argues the advisement of Miranda rights was not necessary because Ms. Pitawanakwat was not in custody at the time of the questioning. (Doc. 49). Alternatively, they argue that if the statements are inadmissible in their case-in-chief, the statements were voluntary and should be admissible for impeachment purposes. Id.

### I. Ms. Pitawanakwat was not in custody when she made statements to Investigator Puckett on August 6, 2020.

An individual is entitled to an advisement of Miranda when that individual is "taken into custody for questioning." United States v. Axsom, 289

4

F.3d 496, 500 (8th. Cir. 2002) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda requires that the individual be advised of "[her] right to be free from compulsory self-incrimination and [her] right to assistance of counsel." Id.

A suspect is in custody when she is "deprived of [her] freedom of action in any significant manner." Axsom, 289 F.3d at 500 (citing United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)). A court considers the totality of the circumstances in deciding whether "a reasonable person in the suspect's position would have understood [her] situation to be one of custody." United States v. Anaya, 715 F.Supp.2d 916, 928 (D.S.D. 2010). The determination of whether a subject is in custody considers both "the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation." Axsom, 289 F.3d at 500.

To determine whether an interrogation occurs in custody, the court must inquire "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). The test focuses on how a "reasonable person in the subject's situation would perceive [her] circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662 (2004). Moreover, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S.

318, 323 (1994).  Thus, "the only relevant inquiry" is whether a reasonable person in Ms. Pitawanakwat's position "would have felt at liberty to end the interrogation and leave." United States v. Brave Heart, 397 F.3d 1035, 1038–39 (8th Cir. 2005).

In United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit identified six factors to consider in determining whether an individual is in custody for the purposes of Miranda:

> (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

Id.  "These factors are not exclusive; custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly.'" United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009) (quoting United States v. Czichray, 378 F.3d 822, 827–28 (8th Cir. 2004)).  The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is an express advisement that the suspect is not under arrest and that her participation in questioning is voluntary.  Brave Heart, 397 F.3d at 1039 (quoting Griffin, 922 F.2d at 1349).  "[N]o governing precedent of the Supreme Court or this court has yet held that a person was in custody after being clearly advised of her freedom to leave or terminate questioning." United States v. Henry, 3:15-CR-30119-RAL, 2016 WL 3339238, at *5 (D.S.D. June 13, 2016) (quoting Brave Heart, 397 F.3d at 1039).

6

Here, the circumstances surrounding the interaction between law enforcement and Ms. Pitawanakwat lead to the conclusion that Ms. Pitawanakwat was not in custody at the time of her questioning.

When Ms. Pitawanakwat was informed that Investigator Puckett wanted to interview her, she agreed and stayed awake for almost two hours until Investigator Puckett arrived on the scene at around 12:30 a.m. Near the end of the interview, Ms. Pitawanakwat stated "I was the only one waiting up cause they said you guys wanted to talk to me." Ex. 1 at 30:37. Additionally, Ms. Pitawanakwat voluntarily came out of her home to answer questions and let herself into the front seat of Investigator Puckett's patrol vehicle.

Ms. Pitawanakwat also had a large degree of freedom of movement during the interaction. Although it is true she was sitting in a patrol car, which did restrict of freedom of movement to some degree, she let herself into the vehicle and never had any sort of physical restraint placed upon her. Law enforcement did not use any strong-arm tactics or strategies, and the tone of the interview was calm and conversational. Lastly, Ms. Pitawanakwat was not arrested at the end of the interview; in fact, she was not arrested until November, 2020.

There are a couple factors; however, that weigh in favor of finding that it was a custodial interview. Although the interview occurred outside of Ms. Pitawanakwat's residence, the atmosphere was primarily police-dominated. There were marked law enforcement vehicles stationed at both roads to and from the residence. There were also several other armed officers at the scene,

7

on the lookout for an active shooter.  Ms. Pitawanakwat was also never expressly told that she was free to leave or terminate the interview. The court finds that these factors do not outweigh the previously discussed factors that weigh in favor a finding that Ms. Pitawanakwat was not in custody.

Considering these factors, and all other circumstances surrounding the interview, the court finds that a reasonable person in Ms. Pitawanakwat's position would've felt at liberty to end the interview and leave the vehicle. Therefore, Ms. Pitawanakwat was not in custody for purposes of Miranda and Investigator Puckett did not violate her 4th amendment rights by failing to advise her of her Miranda rights.

**II.     Ms. Pitawanakwat's statements were voluntary.**

The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence.  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).  Due process requires that confessions be voluntary.  See Brown v. Mississippi, 297 U.S. 278, 285–86 (1936); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process).  "The appropriate test for determining the voluntariness of a confession is 'whether ... pressures exerted upon the suspect have overborne his will.'"  United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir.1989)).

8

Statements are involuntary if they are "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724 (citing Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)). "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker." United States v. Anaya, 715 F.Supp.2d 916, 931 (8th Cir. 2010) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

Here, there is nothing in the record to suggest Ms. Pitawanakwat's statements were involuntary. There were no threats or promises made by law enforcement; nor were there any strong-arm tactics. Ms. Pitawanakwat has experience with law enforcement, and is in fact a firefighter and EMT herself. She informed Investigator Puckett, that she knew what her right were. Here, it is clear that no pressures were exerted upon Ms. Pitawanakwat that would've overborne her will. For these reasons, the statements made by Ms. Pitawanakwat to Investigator Puckett were voluntary.[2]

## **CONCLUSION**

For the aforementioned reasons, it is respectfully recommended Ms. Pitawanakwat's motion to suppress be denied.

---

[2] Although Ms. Pitawanakwat does not argue the statements were involuntary, the court has provided the analysis in the interest of completeness.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 13th day of July, 2021.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge