UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 5:20-CR-50122 |
| Plaintiff | RENEWED MOTION TO COMPEL FED. R. |
| v. | CRIM. PRO.16. DISCOVERY, TIMELY |
| | BRADY DISCLOSURE AND FOR |
| KIMBERLEE PITAWANAKWAT | SANCTIONS INCLUDING CONTEMPT |
| Defendant | |

Kimberlee Pitawanakwat
26214 Foster Road
Monroe, OR 97456
kimberlee.pitankwt@gmail.com

The Honorable Lawrence L. Piersol
United States District Judge
Rm 202 United States Courthouse
400 S. Phillips Avenue
Sioux Falls, SD 57104

Re: Defendant Moves this Honorable Court To Compel Fed. Rule Criminal Procedure 16. Discovery, *Brady v. Maryland* disclosure And For Sanctions Including Contempt and for the following reasons:

**ADDITIONAL FACTUAL BACKGROUND**

1. Defendant draws this Honorable Court's attention to the general factual background presented in Docket No. 240, Defendants first Motion to Compel. The aforesaid Motion was addressed to the District Court Judge currently assigned to Defendant's case, the Honorable Lawrence L. Piersol, but a decision was improperly rendered on that Motion by Magistrate Judge Veronica L. Duffy.

2. On July 5, 2023, the Government filed a seven-page Response (Docket No. 242) to Defendant's Motion to Compel which contained several direct lies to the Court, which will be detailed and evidenced below. The most significant lie, amongst many, presented to the Court was the

following intentional direct misrepresentation: "The United States has no physical evidence in the defendant's case" and "To be clear, there was not a single "spent bullet."" on page 5, paragraphs 2 and 3. This direct lie about the existence of a bloodstained spent bullet (hereinafter bullet), a crucial item of physical evidence located in the alleged victim's front passenger footwell, is a direct lie to this Honorable Court by an Assistant United States Attorney, Officer of the Court, and should not be allowed to stand.

3. This Court should immediately require that AUSA Sazama provide a sworn declaration responding to the direct evidence from Defense Expert John Nixon, including Government discovery photographs provided him by former defense counsel, that there is a bullet at issue in this case, where that bullet is located and why she lied to the Court about its existence. It is ironic that Defendant is falsely charged with lying to a federal agent (assuming that former OSTPS CI Puckett ever was a federal agent) yet AUSA Sazama appears to lie with reckless abandon to this Honorable Court.

4. This Defendant does not assert that AUSA Sazama or the USAO is in personal possession of the spent bullet, but that the law enforcement agents that AUSA Sazama directly oversees, such as the FBI, are in possession of this bullet, or if they are not, then they have deliberately destroyed exculpatory evidence and this conduct is a direct violation of Defendant's Constitutional Rights and AUSA's obligations as a prosecutor.

**A PATTERN OF JUDICIAL MISCONDUCT IN THIS CASE**

5. On July 6, 2023, Magistrate Judge Veronica Duffy issued her Order Denying Defendant's Motion to Compel. Magistrate Judge Duffy acted ultra vires in issuing her ruling because she is not authorized by 28 U.S.C. §636(b)(1)(A) to make such a ruling. A Motion to Compel is defined as a "formal request to the Court to require a party or a non-party in a lawsuit to comply with a discovery request such as a request for production, request for admission, interrogatory, or subpoena." Such a Motion is a request for an injunction, which is defined as: "An injunction is a court order requiring a person to do or cease doing a specific action." Both injunctions and

Motions to Compel require the compulsion power of the Court to make something happen and are definitionally equivalent.

6. Standing Order 21-08 of this Honorable Court is attached to this Motion as Exhibit A. That standing order provides a designation of jurisdiction from the Honorable Lawrence L. Piersol to Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C. §636(b)(1)(A) and provides the following statutory limitation on Magistrate Duffy's jurisdiction:

> "to hear and determine any pretrial matter pending before the court, **except a motion for injunctive relief**, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action."

7. The language "except a motion for injunctive relief" specifically excludes Magistrate Judge Duffy from making decisions in Motions for Injunctive relief, such as Defendant's Motion to Compel. Therefore, Magistrate Duffy was acting ultra vires in issuing her Order (Docket No. 243) denying Defendant's Motion to Compel, and it should be withdrawn and have no authority since the Magistrate was usurping the authority reserved to the District Court Judge.

8. Because the Magistrate issued an ultra vires Order Defendant will not address each of the illegal findings made by Judge Duffy, but instead treat Defendant's initial Motion to Compel and this Renewed Motion to Compel as pending, including Defendant's reasonable request for direct access to discovery in the case, since Defendant now represents herself and such request is reasonable, is allowed by the Local Rules, and is consistent with the practice in most Districts, which allow direct access to discovery in this type of case, particularly where Defendant has been in compliance with all conditions of release for over 2.5 years.

9. In addition, the Magistrate was both legally and factually wrong in many aspects of her hasty ruling, made without opportunity for the Defendant to respond. Magistrate Duffy does not have

authority to overrule Judge Schrier who approved Defendant's request on June 15, 2023, or Eighth Circuit Court of Appeals Chief Judge Lavenski R. Smith, who approved Defendant's request on June 23, 2023. Judge Duffy has vastly exceeded the scope of her authority and acted improperly.

10. If the District Court is unable to appropriately supervise Officers of the Court such as AUSA Sazama, or respect the authority of District Court Judge Karen E. Schreier, or the Eighth Circuit Court of Appeal, then this Court should authorize an interlocutory appeal of this issue to the Eighth Circuit, since the Defendant is in an impossible position, with the supervising Court authorizing testing of a bullet that this Court will not order be made available, and which the Government are allowed to make false statements about with apparent impunity.

11. Magistrate Judge Duffy's immediate ruling against Defendant, the very day after the Government's reply without addressing any of the important points raised in the Motion strongly suggests bias on the part of the Magistrate and is part of a troubling pattern of apparent judicial misconduct in Defendant's case.

12. According to PACER notifications received by Defendant, AUSA Sazama filed her response to Defendant's instant Motion on July 5, 2023, at 2:41 CST. Magistrate Duffy ruled against Defendant in every regard, including testing the bullet, on July 6, 2023, at 11:02 CST.

13. This allowed Magistrate Duffy exactly 5 hours and 21 minutes of regular federal work time to review Defendant's thirteen-page Motion and Proposed Order with nine pages of exhibits and the Government's seven-page pleading, plus reference any other documents in a Court record that she could not be familiar with. Magistrate Duffy was only assigned to Defendant's case after Magistrate Wollmann recused herself because of "the appearance" of bias on May 31, 2023.

14. The Motion that clearly caused Magistrate Wollmann to recuse herself for "the appearance" of bias has improperly not been placed in the record of this case, even though Defendant did not request that it be filed ex parte, so is attached to this Motion as Defendant's Exhibit B. The Defendant apologizes to this Honorable Court for not being able to provide an ECF stamped copy

but no file copy of this document has ever been provided or acknowledged by the Court staff, despite several requests.

15. Said Motion was sent by mail which was reported to be "lost" by the Court. Another copy was sent by certified signature mail and was reported to be in Judge Wollmann's box, by court personnel. Defendant notes that it was addressed to District Judge Viken, not Magistrate Wollmann. Soon after receiving that information Defendant saw in PACER that Judge Wollmann recused herself as Magistrate Judge assigned to Defendant's case.

16. The Defendant contends that the record clearly reflects that Judge Wollmann correctly recused herself because of actual bias against the Defendant, as well as obvious legal and factual errors made in her official duties as a Federal Magistrate Judge. The facts regarding Judge Wollmann's recusal and the reason for it are clear from a review of Defendant's Exhibit B. Judge Wollmann falsely claimed that Defendant might be "abusing the process" when it was the very Court appointed counsel and the Prosecutor that were abusing the process, lying to the Court and falsely making libelous statements about the Defendant.

17. Defendant asserts that an investigation of what has taken place in this case would show improper communication between the Court, Prosecutor and Court appointed Defense counsel. If true, such communications violated Defendant's rights to a fair proceeding, untainted by bias and improper communication between the parties.

18. Prior Court appointed counsel, Jonathan P. McCoy violated his obligation to test relevant physical evidence, as detailed in Mr. Nixon's declaration. This was contrary to promises Mr. McCoy made to the Defendant that if the Defendant located a suitable expert, then he would file a Motion for CJA funds to conduct the required testing, which Mr. McCoy failed to do.

19. The next ineffective counsel appointed by the Court, Mr. Frank Driscoll wrote to the Court and said that there was no evidence that required testing, which was a direct lie, yet Magistrate Duffy required Defendant to continue with Mr. Driscoll as standby counsel, asserting that Mr. Driscoll is an excellent lawyer, in the face of the clear record that Mr. Driscoll lied to the Court, defamed the

Defendant, and failed to file any substantive Motion besides Continuance motions required by his own inability to get the trial preparation work done.

20. The record clearly demonstrates in this case that Mr. Driscoll is not an "excellent" lawyer, because he made direct misrepresentations to the Court, and failed to do the job he is employed to do, which is prepare Defendant's case for trial. Even in the face of Mr. Driscoll's ineffectiveness and lies, Magistrate Duffy continued Mr. Driscoll as Defendant's standby counsel, clearly to make things as difficult as possible for the Defendant. For example, Defendant wrote to Mr. Driscoll requesting that he contact a specific investigator who only communicates with counsel and also for him to suggest the names of other potential investigators that Defendant could retain, with the permission of the Court and the availability of CJA funds, but Mr. Driscoll has failed to provide any helpful information, even though this should be the kind of thing central to the role of standby counsel.

21. The same Magistrate ordered Defendant to appear in person for a 23-minute hearing, knowing that Defendant is indigent, and had to travel over 2,500 miles roundtrip for the hearing. Then, during the hearing Magistrate Duffy continually cut Defendant off, refused to orally rule upon Defendant's Motion for ECF access and generally tried to persuade Defendant to continue with Mr. Driscoll's representation, mentioning that he had been involved in her own law school training in some way and had made an inspirational impact upon her. Judge Duffy should have been aware (Docket No. 218) that Mr. Driscoll has made direct misrepresentations to Magistrate Wollmann in his four-page letter but Judge Duffy cut Defendant off from speaking and referred to that as "all water under the bridge" when in fact it is an important part of the clear record of bias against Defendant in this case and continues a pattern of denial of Defendant's right to be heard. When Defendant continued with her request to represent herself Magistrate Duffy became noticeably displeased.

22. Defendant made a CJA Motion for a transcript of this hearing, which Magistrate Duffy denied. It is convenient that Magistrate Duffy can unilaterally protect her own record by preventing

Defendant's access to the court record of the hearing. The Government and Court are not under this constraint, but this is used by the system as another discriminatory method of keeping little people, such as myself repressed.

23. Mr. Driscoll has been completely incompetent in his role as standby counsel. Detailing all of Mr. Driscoll's failings is beyond the scope of this Motion, but Defendant hereby dismisses Mr. Driscoll and wishes to proceed without standby counsel, since this Honorable Court is unable or unwilling to appoint anyone effective to assist Defendant.

24. The pattern of questionable Judicial conduct in Defendant's case is unfortunately not limited to Magistrate Wollmann and Magistrate Duffy but extends to some actions of the District Court Judges assigned to Defendants case.

25. Judge Viken was the first District Court Judge assigned to Defendant's case and had that role from November 2020 until June 14, 2023, when he issued an order reassigning the case to District Court Judge Karen E. Schreier. Judge Viken's order was eleven working days after Judge Wollmann's order recusing herself from the case.

26. Defendant had been informed by the Court that Judge Viken was retiring in October 2023 and his retirement was therefore not the reason for his assigning a new District Court Judge because Judge Viken had already set a trial schedule in Defendant's case with a trial date of June 16, 2023, well before Judge Viken's retirement date.

27. Defendant appeared in person for a hearing on Defendant's Motion to Proceed Pro Se before Magistrate Duffy on June 5, 2023. The day after that Motion was granted District Judge Viken set an obviously unreasonable trial schedule and dates that the Court knew would be extremely burdensome for the Defendant to comply with. This was obviously arranged to create as much difficulty as possible since Magistrate Duffy refused to orally grant Defendant's Motion for ECF privileges, instead saying that I would need to file a Motion, even though the only way Defendant could file a Motion was by mail, since standby counsel refused to receive email communications from Defendant.

28. It was clearly a concerted effort to attempt to make sure that Defendant should fail to navigate the ECF system and thereby fail to meet the burdensome and unfair trial court schedule imposed by Judge Viken while Defendant was still traveling back to Oregon.

29. When Defendant did attempt to file such a Motion for ECF access it was rejected by the Court and it was only with the help of some individual Clerk's Office staff who assisted Defendant in the ECF registration process.

30. Judge Viken's trial order required a newly pro se Defendant to file all pretrial motions within six days of Magistrate Duffy granting Defendant's motion to proceed Pro Se, and without even being granted ECF privileges. Judge Viken's trial schedule was unreasonable and allowed no time to retain any experts, conduct investigation, challenge the evidence, or do the things necessary for Defendant to prepare the case for trial. This work should have been done by Defendant's prior Court appointed counsel but the Court was already aware that they had not done so.

31. Defendant had written to Judge Viken at least twice requesting his assistance in supervising the court process and making sure that the bullet get tested since Defendant's Court appointed counsel had abjectly failed to do so. Ultimately, Defendant had to fire her counsel and represent herself to get the request for testing approved by the Eighth Circuit and Judge Schreier, see: Docket No. 235, Defendants Motion for CJA Funding To Retain Forensic Firearms and Ballistics Expert and Order For Expert Access to The Discovery and Evidence, incorrectly referenced in ECF as a Motion for Miscellaneous Relief.

32. Defendant's Motion, Docket No. 235, includes the following language: "and for an Order directing the Government to provide Mr. Nixon necessary access to all discovery and physical evidence." This Motion was approved by District Court Judge Karen E. Schreier and then by Eighth Circuit Chief Judge Lavenski R. Smith on June 23, 2023. Judge Lavenski appended his electronic signature to Defendant's request and therefore granted Docket No. 235, which includes an Order directing the Government to provide access to all physical evidence. See Defendant's

Exhibit D, CJA Voucher No. 0869.1570985. When the Court refuses to grant access to the physical evidence it is acting in violation of an Order from the Eighth Circuit Chief Judge.

33. The very day that Defendant filed Docket No. 235, Judge Viken reassigned the case to District Court Judge Karen E. Schreier, tacitly admitting that he was wrong to ignore Defendant's repeated requests for the assistance of the Court in getting this testing accomplished. Defendant asserts that this record is really one of recusal for demonstrated bias rather than one of reassignment because of pending retirement, since that explanation is not consistent with the court record.

34. Judge Karen E. Schreier was appointed as District Court Judge on June 14, 2023, by Judge Viken, by text order, as discussed above. On June 15, the very same day that Defendant filed her Motion, Docket No. 235, Judge Schreier granted Defendants Motion and indicated that it would need to be sent to the Eighth Circuit with additional information, which was done that same day by Defendant. It is quite apparent from this record that it was a matter of urgency that the Court review and decide Defendant's Docket No. 235 Motion since Judge Schreier immediately granted a Motion in a case that she could not have been familiar with. This suggests that there must have been some kind of Judicial conference about Defendant's case.

35. Judge Schrier granted Defendant's motion for a Continuance, Docket No. 237 in her order Docket No. 239. Defendant also filed a Motion to Dismiss, Docket No. 238 and a Motion to Compel, Docket No. 243, filed on June 27, 2023. This Motion included a comparison between the way Defendant has been improperly treated and comparison to the clear preferential treatment provided by the Department of Justice and the Court System to Hunter Biden, presumably because he is the son of the President.

36. The day after this filing, on June 28, 2023, by text order, Judge Schreier reassigned the case to District Court Judge Lawrence L. Piersol. Judge Piersol entered his trial schedule Order on July 11, 2023, ordering that the trial take place in Deadwood, South Dakota.

37. The District Court website for the Federal Court indicates the following in relation to the assignment of Judges (bolding added):

> "Judge assignment methods vary. The basic considerations in making assignments are to assure equitable distribution of caseload and **avoid judge shopping**. By statute, the chief judge of each district court has the responsibility to enforce the court's rules and orders on case assignments. Each court has a written plan or system for assigning cases. The majority of courts use some variation of a random drawing. One simple method is to rotate the names of available judges. At times judges having special expertise can be assigned cases by type, such as complex criminal cases, asbestos-related cases, or prisoner cases. The benefit of this system is that it takes advantage of the expertise developed by judges in certain areas. Sometimes cases may be assigned based on geographical considerations. For example, in a large geographical area it may be best to assign a case to a judge located at the site where the case was filed. **Courts also have a system to check if there is any conflict that would make it improper for a judge to preside over a particular case.**"

38. Contrary to this information and good judicial practice the Judicial assignments in Defendant's case have not occurred in a random manner, have been oddly timed in relation to Defendant's Motions and do not appear to have been made to avoid "Judge Shopping" or to avoid "any conflict that would make it improper for a Judge to preside over a particular case."

39. For example, the Defendant, in Docket No. 243, which is still pending before this Court based upon Defendant's arguments presented above, makes a very clear comparison between the Defendant's case and the favorable treatment afforded the current Democratic President's son, Hunter Biden.  It is completely inappropriate to immediately assign Defendant's case to Judge Piersol, who is described on his Wikipedia page as a: "member of the Democratic Party, he served in the South Dakota House of Representatives, serving as Minority Whip (1971 to 1972) and

Majority Leader (1973 to 1974)." Judge Piersol is a former senior Democratic party official and should not have been appointed to Defendant's case since to do so violated the Court's own published conflict rule.

40. In addition, Judge Piersol, in his trial order assigned the Case for trial in Deadwood. According to the Court's own website there is no regular Federal Court in Deadwood and Judge Piersol's reasoning for scheduling the trial there, without first discussing it with the parties, appears to also violate the Court's rules. Defendant is entitled to a jury of her peers, according to the U.S. Constitution, yet Judge Piersol immediately scheduled the trial to take place in the most racist and non-native American area of South Dakota, in clear contravention of Defendant's interests.

41. Judge Piersol should immediately recuse himself from this case for actual bias, conflict of interest, and for failing to follow the Court's own rules for assignment of District Court Judges.

**PROSECUTORIAL MISCONDUCT**

42. As discussed in paragraphs 2-4 above the Government provided a detailed Response to Defendant's Motion to Compel. In that document the Government falsely asserted that it has no bullet and no physical evidence.

43. Attached to this Motion as Defendant's Exhibit C is the sworn statement of John Nixon, defense expert and Board-Certified Forensic Engineering Scientist. Mr. Nixon recounts how he was contacted by Jonathan P McCoy, former Court appointed counsel to the Defendant about "possible examination of a bullet (projectile) recovered during the investigation of the above captioned matter" (Nixon paragraph 4).

44. On October 25, 2021, Mr. McCoy sent Mr. Nixon two photographs depicting a bullet (projectile) that was discovered in the alleged victim's vehicle. Mr. Nixon identifies these photographs as Dull Knife et al 0281 and Dull Knife et al 0282 with the following captions DSC 0148 and DSC 0149 (see Nixon paragraph 5). These photographs are the same as the ones Defendant personally saw during supervised discovery review at the Federal Public Defender's Office in Portland and are attached to Mr. Nixon's under oath declaration.

45. Mr. Nixon indicates that he told Mr. McCoy: "that the bullet in the photograph appeared to be a pistol bullet, not a rifle bullet." Mr. Nixon also "informed Mr. McCoy that it would be possible to distinguish a pistol bullet from a rifle bullet by means of a personal physical examination." Mr. Nixon also opined that he would probably be able to provide a short list of brands and models of firearms that could have fired the bullet. This testing was crucial for the Defendant because the Government's whole case was built upon the supposed evidence that an AR15 rifle fired the bullet. If that information is a deliberate lie, presented to the Court to obtain false warrants to Search and then Arrest then that is a serious Miscarriage of Justice.

46. For reasons that are unclear but are also extremely troubling Mr. McCoy refused to file a Motion for CJA funding for testing of the bullet and point-blank refused Defendant's repeated requests to get the evidence tested. Eventually the Defendant succeeded in getting Mr. McCoy removed from her case, only to have him replaced by another ineffective counsel, Mr. Frank Driscoll, who is Defendant's current standby counsel, appointed to that role by Magistrate Duffy, over Defendant's continuing objection.

47. The sworn information provided by Mr. Nixon demonstrates that the Government should have been aware as soon as it was recovered that the bullet could not have come from an AR15 rifle since that is obvious from a visual examination, yet they presented false information to the Court to obtain a search warrant and arrest warrants.

48. My extensive notes from discovery review indicate that the officers who recovered the bullet wrote that the bullet appeared to be bloodstained, indicating it was the bullet that struck Ms. Burgee causing the injury at issue in this case, particularly since it was located directly in front of Ms. Burgee's location in the vehicle on a bloodstained floormat (See Nixon Declaration and photos). For the Government to lie to the Court and pretend that this evidence does not exist, and is not important, is the most outrageous lie, particularly given that the preliminary information provided by Mr. Nixon is that his opinion is exculpatory and certainly extremely helpful to the

Defendant. AUSA Sazama should be held in contempt of court for deliberately lying about the existence of this physical evidence.

49. The forensic testing of the bullet is of paramount importance to the Defense for several reasons, not solely because the AR15 rifle lie supported the warrants at issue in this case. Several other police reports discuss the significance of an AR15 weapon and alleged that Defendants former co-defendant was seen with an AR15 weapon. There is also an audio recorded statement in discovery from Ian Dull Knife, a jailhouse informant, who falsely told former CI Puckett that he saw George Dull Knife shoot repeatedly at the alleged victims with an AR15 rifle and then saw George Dull Knife hand the rifle to the Defendant. This statement is false, presumably made in exchange for Ian Dull Knife's release from jail. If the bloodstained bullet did not come from an AR15 rifle it proves that Ian Dull Knife is lying and the whole case against Defendant is built upon a known fabrication.

50. AUSA Sazama presents the position that the United States discovery obligation is concluded, as if the Government does not have a continuing discovery obligation, just like it has a continuing obligation to provide *Brady* and *Giglio* evidence. The Due Process Protections Act provides that the Government is required to provide **timely** disclosure of Brady information, yet at nearly three years into this case the Defendant has received nothing, and the Government's position is that it will provide nothing and does not need to look for anything. Indeed, the Government's *Brady* and *Giglio* obligations are significant.

51. Defendant has provided prima facie evidence that former OSTPS CI Puckett is no longer a police officer since he currently finished training to become a school security guard. The Government has not responded to Defendant's exhibit evidence (Law Enforcement School Sentinel Training Certificate for former CI Puckett) that former OSTPS CI Puckett is no longer an officer, so the Government has waived any argument in that regard. The Government's waiver establishes that there is *Brady, Giglio* and *Henthorn* material relating to Puckett.

52. The Government cannot avoid knowing or looking for such evidence by pretending it does not exist. In relation to Puckett, the Government's waiver of argument requires that the Court accept that this is factually true and requires that the Court order **timely** production of *Brady, Giglio* and *Henthorn* material relating to Puckett. Given AUSA Sazama's direct misrepresentations to the Court about the evidence she should be required to make these disclosures under oath under penalty of contempt or other sanction.

53. Why would a long serving police officer in the prime of his career, having just been promoted to the position of criminal investigator become a school security guard, which is hardly a career advancement? The information from Puckett's school security guard certificate is consistent with the evidence already provided by Defendant from a confidential source that Puckett was suspended for misconduct and left the force. This Court cannot rely upon assertions made by AUSA Sazama or her silence about Puckett, since the evidence establishes that she directly lied about the existence of the bullet at issue in this case. Ms. Sazama must be ordered to comply with her obligations, upon pain of a Contempt sanction.

54. AUSA Sazama indicates at page 5 and 6 that the Government is unaware whether Ian Dull Knife has proffered or acted as a confidential informant in any case with the United States. This statement is false on its face and misleading, since it is apparent that Mr. Ian Dull Knife acted as a classic jailhouse informant in this case. If Ian Dull Knife obtained any benefit in exchange for his information, such as release from jail, or payment, or has received such benefits in any other case, then it is the Government's responsibility to become aware of this information and disclose it to the Defendant in a "timely manner" in accordance with the Due Process Protections Act, a statute that was enacted in order to remedy repeated violations of *Brady* and its progeny by the Government.

55. The Defendant appeared by video at the Motion to Suppress hearing where then officer Puckett testified. Defendant was in communication with her then counsel, Jonathan P. McCoy, by phone. During the hearing Mr. McCoy informed Defendant that Puckett appeared to have an attorney

with him. AUSA Sazama was not present at the hearing, so has no personal knowledge of the issue one way or another. The appropriate remedy for factual disputes of this sort is for the Court to allow the issuance of subpoenas and have the participants make statements under oath about the presence of an attorney for Mr. Puckett or not. Defendant is perfectly willing to make such an under-oath statement. Such statements or declarations can be obtained from Judge Wollmann, Mr. Patterson, Mr. McCoy, Mr. Puckett, and Court staff who were present in the Courtroom. It is likely that someone probably recognized the attorney in question and this factual question can be settled.

56. Obviously, the U.S. Marshal's service ensures secure access to all federal courthouses, so there would potentially be video evidence of those entering the courthouse to attend the hearing as well as video security surveillance of the hearing itself.  In addition, some federal facilities maintain a visitor log, which can be subpoenaed, if applicable.

57. It is also quite consistent with the evidence Defendant has already submitted (Puckett's school security guard certification), uncontroverted by the Government, that he is no longer a police officer and obviously subject to scrutiny by the time of the Suppression hearing. If Puckett was still a police officer it would be very easy for the Government to say that, but it remains silent, or continues to lie about his true status.

58. At Government's Response paragraph 2 the Government appears to misunderstand its *Brady* and *Giglio* obligation. The Government has an affirmative obligation to locate such information, particularly when the Defendant has made an uncontroverted prima facie case that such evidence exists. The Government makes the following absurd statement regarding Puckett: "The United States disputes the allegations made about Investigator Puckett in Paragraph 18 and 19," but mysteriously remains silent about what is in dispute. Defendant provided a certificate from Puckett's personal Facebook account showing he finished training to become a school security guard, so there is not really anything to dispute. Defendant is perfectly willing to put this

statement under oath or test it at an evidentiary hearing where Puckett is called as a witness to testify about his status.

59. Defendant agrees that many pointless unviewable copies of Isaiah Crow's bodycam and dashcam footage were previously provided to Defendant in supervised discovery, as well. The point here is that Defendant has not been able to view the footage because of a technical issue. The Government has a continuing obligation to provide such discovery to Defendant in a format that is viewable.

60. Defendant has not been provided with the same discovery information as her former co-defendant – this is another direct lie. If that is the case then it will be easy for the Government to provide another complete copy for review, since the Government's obligation is a continuing one. Given AUSA's repeated misrepresentations to the Court regarding this case she should be required to make an under-oath declaration regarding each and every disputed discovery issue.

61. The Government indicates that it will "make available to the defendant the transcript of her codefendant's change of plea hearing." At the time of writing this pleading this transcript has not been provided. The Government asserts that it has no other statements from George Dull Knife but given AUSA Sazama's other misrepresentations to the Court it is not reasonable to expect Defendant to trust this statement unless it is made under oath.

62. As part of AUSA's false statements about the evidence in this case she mentions the "*many* "spent bullets"" but fails to mention that there was only one relevant bullet recovered from the scene, which was the bloodstained spent bullet (See Nixon Declaration, Defendant's Exhibit C). All other bullets were either unfired and located in the house, or obviously old and completely irrelevant to the case. Any cursory review of the discovery makes this obvious. There was an extensive search of the driveway for shell casings from the "AR15", which located exactly nothing.

63. The Government is already aware that Ian Dull Knife is a jailhouse informant in this case. The current issue is whether he was provided a benefit, such as immediate release from jail to reward

him for his false statement. The Government can easily ascertain this from reviewing jail records relating to his charges and what date and time he was released from jail on those charges and whether they were dropped, and whether that was as a benefit for his false testimony to former CI Puckett. There are obviously other significant records about Ian Dull Knife and others involved in this case that should have been disclosed by the Government. This criminal history information should already have been provided to the Defendant as part of Rule 16 discovery and also as *Brady* information. This should include all police reports.

64. It is not sufficient for the Government to provide "criminal history reports" on October 13, 2023, since this is not timely and allows the Defendant no time before trial to review such documents or obtain other relevant information that may be referenced. The Due Process Protections Act requires TIMELY disclosure of exculpatory information, and this is clearly not timely or sufficient, since it excludes actual police reports that are potentially exculpatory. These reports bear on the credibility of Government witnesses and are core *Brady* information so should have been disclosed already.

65. As one example, which is certainly not exhaustive, given the multitude of criminal cases involving registered sex offender K.T. Burgee, the Defendant has become aware that Mr. Burgee has been federally charged in yet another federal criminal case, *United States v. Burgee* 3:22CR30069 with a violation of 18 USC§§1153, 2241(a)(1) and 2246(2) Aggravated Sexual Abuse by Force.  It appears that the Government does everything in its power to help a repeat rapist and sex offender and keeps this information private even though it is clearly relevant, clearly exculpatory, and impeaches Mr. Burgee, a Government witness. The Defendant assumes that the Government believed it would be able to hide this new extremely serious charge against one of its witnesses from the Defendant.

**REMEDIES**

66. Although this Motion is titled a Motion to Compel it also raises considerable issues of Judicial Misconduct, Prosecutorial Misconduct, Due Process and Equal Protection violations. Magistrate

Duffy should recuse herself from any further part in my case for the reasons expressed in this Motion, for clear bias and for repeated errors and acting outside of her authority.

67. District Court Judge Piersol should recuse himself from any further proceedings in relation to my case because he was appointed in violation of the Court's published conflict rules, has a clear bias as a former official of the Democratic party and unilaterally set the case for trial in a jurisdiction away from the appropriate jurisdiction for trial without consulting the parties and in violation of the Defendant's right to a jury of her peers.

68. The Court should fashion an appropriate remedy for the clear false statements made by AUSA Sazama and in particular that there is not a single bullet at issue in my case. This AUSA has repeatedly lied about the prosecution in this case and she should be held in Contempt of Court and an investigation of her should be referred to the Office of Professional Responsibility and the South Dakota Bar. The Court cannot allow Prosecutors to lie with impunity or it brings the entire system of justice into disrepute.

69. This Court should order the Government to provide Defense Expert John Nixon access to the Discovery, unhindered Access to the bullet for testing consistent with Defendants Exhibit D, CJA Voucher 0869.1570985, electronically signed by Judge Karen E. Schreier and Eighth Circuit Chief Judge Lavenski R. Smith.

70. To address the repeated failures on the part of the Government to provide Rule 16 discovery, *Brady* and *Giglio* information, appropriate responses to Court approved forensic testing and to remedy the unfair and unequal treatment provided in this case the Defendant Respectfully Moves this Honorable Court for an Order requiring strict compliance with the Government's obligations within fourteen (14) days of the Court's Order.


WHEREFORE Defendant respectfully prays this Honorable Court for its Order to Compel Fed. R. Crim. Pro. 16. Discovery, timely *Brady,* and *Giglio* Disclosure and for Additional Relief as detailed in the body of this Motion.

Dated this 19th day of July 2023

Respectfully,

/s/ Kimberlee Pitawanakwat

Kimberlee Pitawanakwat
26214 Foster Road
Monroe, OR 97456
kimberlee.pitankwt@gmail.com

cc: Heather Sazama, Assistant United States Attorney, District of South Dakota, via email:
Heather.Sazama@usdoj.gov